Receipt number AUSFCC-11251091

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

GROWTH OPPORTUNITY PARTNERS,

        Plaintiff,

v.

THE UNITED STATES,

        Defendant.

Case No.  **26-691 C**

## COMPLAINT

### NATURE OF THE DISPUTE

1.    This case is a breach of contract action arising from the U.S. Environmental Protection Agency's ("EPA") decision to unilaterally terminate a competitive grant awarded to Plaintiff, Growth Opportunity Partners ("Growth Opportunity") under the Solar for All zero-emissions technologies program ("Grant Agreement"). The Grant Agreement gave rise to binding contractual obligations between EPA and Growth Opportunity, and Growth Opportunity seeks money damages resulting from EPA's breach.

2.    On July 12, 2024, EPA awarded Growth Opportunity a $156,120,000 Solar for All grant. Under the Notice of Award, the grant became binding when Growth Opportunity accepted the award by not filing a disagreement within 21 days. Before EPA's abrupt breach of the Grant Agreement, EPA obligated $7 billion in grant funding that Congress appropriated to EPA to provide to states, territories, Tribal governments, municipalities, and nonprofits across the country to develop long-lasting solar energy programs. Congress directed EPA to award these grant funds to enable low-income and disadvantaged communities to deploy and benefit from zero-emission technologies including distributed residential solar, lowering energy costs for families, and

reducing the risk of utility shut offs, creating good-quality jobs, advancing environmental justice, and mitigating the effects of climate change.

3.    EPA conducted a competitive review process, selected the grantees, obligated the grant funds, and entered into agreements and approved workplans for each grantee. With respect to Growth Opportunity, EPA entered into a binding grant agreement and obligated the funding from the Solar for All appropriation by October 25, 2024.

4.    Growth Opportunity received the full grant amount in its Automated Standard Application for Payment ("ASAP") account and began to perform under its Grant Agreement.

5.    In July 2025, a subsequent Congress repealed large portions of the Greenhouse Gas Reduction Fund, but it did not retroactively repeal the Solar for All program.

6.    That same Congress rescinded only "*unobligated* balances," thereby preserving all $7 billion in funding that EPA already had awarded and obligated through Solar for All grant agreements.

7.    Despite Congress's decision to rescind only unobligated balances and despite the fact that Solar for All grant funding obligated to Growth Opportunity's Grant Agreement was already disbursed into Growth Opportunity's ASAP account and was unaffected by the repeal, EPA announced the cancellation of the Solar for All program on or about August 7, 2025.

8.    EPA then unilaterally terminated Growth Opportunity's Grant Agreement—a clear, unambiguous, and material breach of the agreement between EPA and Growth Opportunity.

9.    By August 8, 2025, EPA withdrew approximately 90 percent ($144,102,757.27) of the obligated and disbursed grant funds from Growth Opportunity's ASAP account.

10.    EPA's unilateral termination and withdrawal of obligated and disbursed funds breached the express terms of Growth Opportunity's Grant Agreement, which permitted

termination only in three narrow circumstances: (a) noncompliance that materially impairs performance; (b) adequate evidence of waste, fraud, or abuse; or (c) material misrepresentations of eligibility status. None of these circumstances occurred, nor has the EPA ever made such claims against Growth Opportunity.

11.    EPA's actions interfered with Growth Opportunity's performance under the Grant Agreement and destroyed Plaintiff's reasonable expectations regarding the fruits of its Grant Agreement.

12.    EPA purportedly acted based on its misguided understanding of the One Big Beautiful Bill Act ("H.R. 1"), which repealed Section 134 of the Clean Air Act and rescinded only "the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act)."  Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025) (emphasis added).  Because EPA had fully obligated the Solar for All funds awarded to Growth Opportunity well before the enactment of H.R. 1, those funds were not "unobligated" on the day before enactment of H.R. 1 and therefore were not rescinded by that Act.

13.    Consistent with the statutory text, the Congressional Budget Office ("CBO") calculated that § 60002 of H.R. 1 would rescind only approximately $19 million—representing the remaining unobligated funds set aside for EPA's administrative costs. CBO, *Estimated Budgetary Effects of Public Law 119-21* (July 21, 2025), https://www.cbo.gov/publication/61570 (Title VI, § 60002 ("Repeal of Greenhouse Gas Reduction Fund")) (Budget Authority - $19M; Outlays - $19M) (Excel spreadsheet). Notwithstanding the rescission of these funds, EPA had other appropriations available and continued to administer the Solar for All program for weeks after H.R. 1 became law.

14.     On March 15, 2025, the 119th Congress (2025-2026) passed a continuing resolution that appropriated $3,195,028,000 for the "Environmental Protection Agency—Environmental Programs and Management" for the 2025 fiscal year. Pub. L. 119-4, § 1802(3), 139 Stat. 9, 30 (Mar. 15, 2025). These funds remained available for the EPA to carry out its work, including the administration of lawfully awarded grants, such as Growth Opportunity's Grant Agreement.

15.     In its August 2025 Termination Memorandum, EPA asserted that §60002 of H.R. 1 repealed the statutory authority for the Solar for All program and eliminated *all* appropriations necessary to continue administering Solar for All awards, including Plaintiff's. EPA stated that, because Congress had repealed Section 134 of the Clean Air Act and rescinded appropriations "to carry out" that section, the agency no longer possessed any legal authority or funding to oversee, monitor, or implement existing Solar for All grants. EPA represented that this perceived loss of statutory authority and appropriations required it to terminate Plaintiff's Grant Agreement.

16.     EPA's position is erroneous as a matter of statutory interpretation and equally erroneous as a matter of contract law: EPA's interpretation of H.R. 1 does not constitute a permissible ground for termination under the express terms and conditions of the Grant Agreement.

17.     By unilaterally cancelling the Grant Agreement without any legally sound justification and seizing the awarded funds from Growth Opportunity, EPA breached the express terms of the Grant Agreement and violated the covenant of good faith and fair dealing.

18.     Growth Opportunity files this suit to recover money damages for EPA's breach of the Grant Agreement.

**<u>JURISDICTION</u>**

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a)(1) (the "Tucker Act") because the claims against the United States are founded upon a contract with the

United States.[1] *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (Barrett, J., concurring) ("[P]laintiffs' challenges to the grant terminations belong in the [U.S. Court of Federal Claims]").

20.    Growth Opportunity does not seek either specific relief or reinstatement of the Grant Agreement, as such non-monetary claims fall within the jurisdiction of the federal district courts. *See Bowen v. Massachusetts*, 487 U.S. 879, 894-95(1988).

## PARTIES

### Plaintiff

21.    Growth Opportunity is a national 501(c)(3) nonprofit organization headquartered in Cleveland, Ohio. Growth Opportunity is a mission-based community financial institution and Green Bank dedicated to providing community development capital, services, and solutions to growing small businesses, primarily located in communities with limited resources. Growth Opportunity was created to make capital, professional high quality advisory services, and data accessible to historically underserved communities. Growth Opportunity is the recipient of Grant Number ("FAIN") 84087601 from the EPA.

---

[1] Growth Opportunity files this action solely to seek money damages for Defendant's breach of the Solar for All Grant Agreement, and does not waive any rights to challenge any agency action related to Solar for All in any other forum. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660-62 (2025) (Barrett, J., concurring). Growth Opportunity brings this claim as a breach-of-contract action only to satisfy the jurisdictional requirements of the Tucker Act for claims seeking money damages in the U.S. Court of Federal Claims. Nothing in this pleading should be construed as a concession that all federal grants, including other Solar for All awards, constitute contracts for Tucker Act purposes, or that all challenges to the termination of such grants necessarily sound in contract or must be brought in this Court.

**Defendant**

22.     Defendant is the United States of America, acting through the United States Environmental Protection Agency—an independent agency within the executive branch of the United States government—and its Administrator, Lee Zeldin. EPA is a party to the grant agreement at issue in this case.

## FACTUAL BACKGROUND

**Congress establishes the Greenhouse Gas Reduction Fund.**

23.     On August 16, 2022, the Inflation Reduction Act was signed into law. Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022).

24.     One provision of the Inflation Reduction Act created a $27 billion "Greenhouse Gas Reduction Fund" by adding a new Section 134 to the Clean Air Act. *Id.* at 2065-66, *repealed by* Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025).

25.     As part of the Greenhouse Gas Reduction Fund, Congress appropriated $7 billion for EPA to use to support "zero-emission technologies." Pub. L. No. 117-169, 136 Stat. at 2066. Specifically, Congress directed EPA "to make grants, on a competitive basis . . . to States, municipalities, Tribal governments and eligible recipients for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." *Id.* Eligible recipients included nongovernmental agencies such as Plaintiffs. *Id*. at 2067.

26.    Congress thereby provided statutory authorization for EPA's authorized representatives to bind the United States in grant agreements created from the Greenhouse Gas Reduction Fund.

27.    Congress appropriated this $7 billion for fiscal year 2022, directed that EPA begin making grants "not later than 180 calendar days after August 16, 2022," and provided that the appropriated funds would "remain available until September 30, 2024." *Id.* at 2066.  Thus, EPA had a 2-year period to award the funds that Congress had created.

28.    Congress also appropriated $30 million to EPA—"[i]n addition to amounts otherwise available"—for the "administrative costs necessary to carry out activities under" the Greenhouse Gas Reduction Fund.  *Id.* at 2067.

**EPA creates the Solar for All grant program.**

29.    Beginning in October 2022, EPA undertook a months-long public stakeholder engagement process to inform its implementation of the Greenhouse Gas Reduction Fund appropriations, including how to design its competitive grant programs.  *See* Richard K. Lattanzio, Cong. Research Serv., IF12387, *EPA's Greenhouse Gas Reduction Fund (GGRF)* 1-2 (May 21, 2024), https://www.congress.gov/crs-product/IF12387.

30.    On June 28, 2023, EPA published a Notice of Funding Opportunity ("NOFO") for the zero-emissions technology competitive grant program, which the agency called "Solar for All."

31.    On August 31, 2023, in a revised NOFO, EPA extended the application deadline, adjusted award size requirements, and made other minor adjustments.  *See* EPA, *Revised Solar for All Notice of Funding Opportunity*, Funding Opportunity No. EPA-R-HQ-SFA-23-01 (Aug. 31, 2025), https://www.grants.gov/search-results-detail/348957.  A true and exact copy of the Revised Solar for All NOFO is attached as Exhibit A.

32.    The NOFO invited eligible applicants to apply for one of up to 60 Solar for All awards—totaling approximately $7 billion—that would "advance the three overarching [Greenhouse Gas Reduction Fund] program objectives": (1) "Reduc[ing] emissions of greenhouse gases and other air pollutants"; (2) "Deliver[ing] benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities"; and (3) "Mobiliz[ing] financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects." *Id.* at 6-7, 24.

33.    To be eligible to apply to the Solar for All competition, applicants were required to submit Notices of Intent ("NOI") that described, among other things, the expected number of applications, the program locations, and the expected amount of funding requested. *Id.* at 18-20. Growth Opportunity submitted its NOI as required on August 14, 2023. A true and exact copy of the Notice of Intent is attached as Exhibit B.

34.    Each Solar for All application had to adhere to extensive requirements prescribed by EPA in the NOFO.  Each applicant was asked to, among other things: provide a specific program narrative explaining "how you will develop and execute a robust and equitable program that enables the rapid deployment of distributed solar and associated storage with meaningful benefits to low-income and disadvantaged communities"; provide a program administrative narrative describing "how you will administer the grant program and demonstrate you have the policies, procedures, tools, and capabilities to successfully achieve the program goals"; and provide a reporting plan describing a "plan to execute against the grant's reporting requirements, including tracking and measuring progress in achieving expected environmental outputs and outcomes." Ex. A [Revised Solar for All NOFO] at 44-49.

35.     The NOFO made clear that the competitive Solar for All grant awards were "designed to spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans and catalyze transformation in markets serving low-income and disadvantaged communities." *Id.* at 5.  The Solar for All grants were intended to help "transform the clean financing ecosystem in the United States, especially in low-income and disadvantaged communities" and "deliver on the climate and environmental justice goals of the United States." *Id.*  As the NOFO recognized, "[p]er Section 134(a)(1) of the Clean Air Act, 100% of Solar for All funds must be deployed 'to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.'" *Id.*

36.     Applications for awards were to be submitted by October 12, 2023, at 11:59 p.m. *Id.* at 39.  Growth Opportunity submitted an application by this deadline.  A true and exact copy of Growth Opportunity's Solar for All application is attached as Exhibit C.

37.     EPA evaluated each Solar for All application that met threshold eligibility criteria under a 245-point scoring system. Ex. A [Revised Solar for All NOFO] at 51. Points were assigned across the NOFO's required components, including the Program Strategy Narrative, which could receive up to 175 points based "on the quality and extent to which [each application] articulates a plan to use grant funds to advance [Greenhouse Gas Reduction Fund] program objectives." *Id.* The NOFO further allocated these points among specific evaluation factors within the Program Strategy section (*see id.* at 51-60), and assigned the remaining 70 points across evaluation factors in the Program Administration Narrative and the Programmatic Capabilities and Environmental Results Past Performance sections. *Id*. at 51-62.

38.     After the Solar for All grant application period closed in October 2023, EPA commenced a rigorous, multi-stage application review process.  According to EPA, "[t]his

multi-stage process included review from hundreds of experts in climate, power markets, environmental justice, labor, and consumer protection" from across multiple agencies. U.S. EPA, News Release, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America* (April 22, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.

39.     On April 22, 2024, EPA announced that it had selected 60 applicants to receive Solar for All grants, including "states, territories, Tribal governments, municipalities, and nonprofits." *Id.* Growth Opportunity was among the Solar for All recipients.

40.     Between April and August of 2024, EPA worked with Growth Opportunity to finalize how it would operate its Solar for All program, which was memorialized in a Grant Agreement (hereinafter the "Initial Grant Agreement"). A true and exact copy of Growth Opportunity's Initial Grant Agreement is attached as Exhibit D.

41.     Under the Initial Grant Agreement, EPA awarded Growth Opportunity a sum of money and informed it that "[t]he recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after EPA award or amendment mailing date." Ex. D [Growth Opportunity's Initial Grant Agreement] at 1 (Ex. D).

42.     Growth Opportunity also agreed to be subject to an array of administrative and programmatic requirements in implementing the Initial Grant Agreement. For example, Growth Opportunity agreed to, among other things: submit performance reports and transaction-level and project level data, *id.* at 6-8; "implement this grant in accordance with its EPA-approved Solar for

All Workplan," *id.* at 16; "only use the award to support . . . allowable activities" and "not use the award for . . . unallowable activities," *id.* at 17; and "ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies." *Id.*

43.    Growth Opportunity's Initial Grant Agreement also contained a termination provision in the terms and conditions that included references to both 2 CFR §§ 200.339 and 200.340. *Id.* at 29.

44.    Specifically, in Growth Opportunity's Initial Grant Agreement, the termination provision reads:

> EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR [§] 200.339 and 2 CFR [§] 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

Ex. D [Growth Opportunity's Initial Grant Agreement] at 29.

45.    EPA entered into the Initial Grant Agreement pursuant to its statutory mandate to "make grants . . . for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." 136 Stat. at 2066.

46.     The Initial Grant Agreement became binding on both parties "21 days after EPA award . . . mailing date," by the recipient either "drawing down funds" or "not filing a notice of disagreement with the award terms and conditions."  Ex. D [Growth Opportunity's Initial Grant Agreement] at 1.  The mailing date on Growth Opportunity's Grant Agreement was July 17, 2024, so Growth Opportunity's Initial Grant Agreement became binding on both parties by August 7, 2024. *Id.*

47.     The Initial Grant Agreement was digitally signed by an EPA award official on behalf of the United States. *Id.*

48.     The Initial Grant Agreement anticipated that Plaintiff would spend time working with EPA to finalize program workplans and budgets before beginning to implement its program and funding projects in early 2025. *Id.* at 15-16.

49.     Relying on the obligated award funds, Growth Opportunity negotiated a workplan and proposed budget with EPA.  The workplan process included identifying program areas for funding, detailing how funds would be allocated, and outlining terms and conditions. Until the workplan was approved, Growth Opportunity was restricted to drawing down no more than 2% of its obligated funds to ensure that adequate funds would be available to carry out its authorized projects after the program launched. *See id.* at 15. A true and exact copy of Growth Opportunity's Solar for All Work Plan is attached as Exhibit E.

50.     On January 6, 2025—after Growth Opportunity finalized its workplan and obtained EPA's approval—EPA issued an Assistance Amendment (hereinafter the "Amended Grant Agreement") that lifted the 2% funding restriction. The Amended Grant Agreement authorized Growth Opportunity to access the full amount of its obligated funds and begin implementing its

program.  A true and exact copy of Growth Opportunity's Amended Grant Agreement is attached as Exhibit F.

51.    Growth Opportunity's Amended Grant Agreement contained an updated termination provision in the terms and conditions.  The termination provision in the Amended Grant Agreement reads:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

Ex. F [Growth Opportunity's Amended Grant Agreement  (Jan. 6, 2025)] at 26.

52.    The termination provision in the Amended Grant Agreement is nearly identical to the one in the Initial Grant Agreement, except that: (a) it expressly incorporates the version of 2 C.F.R. § 200.340 "effective as of October 1, 2024;" (b) it adds "material misrepresentation of eligibility status" to the grounds for termination; and c) EPA agrees to "re-obligate funds to [an] Eligible Recipient" that "assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient." *Id*.

53.    On January 6, 2025, EPA mailed its Amended Grant Agreement to Growth Opportunity.  *See* Ex. F [Growth Opportunity's Amended Grant Agreement (Jan. 6, 2025)] at 1.

Under the terms of the Notice of Award, Growth Opportunity's Amended Grant Agreement became binding no later than January 27, 2025—"21 days after EPA award . . . mailing date"—either by the Plaintiff "drawing down funds" or "not filing a notice of disagreement with the award terms and conditions." *Id.*

54.    Growth Opportunity's Amended Grant Agreement was digitally signed by an EPA award official on behalf of the United States. *Id.*

55.    Through the first months of 2025, Growth Opportunity continued to perform under the Grant Agreement. Growth Opportunity continued to draw down funds under the Grant Agreements from its ASAP accounts.

56.    On or about August 8, 2025, EPA withdrew or caused to be withdrawn approximately $144,102,757.27 from Growth Opportunity's ASAP account in connection with its Solar for All Grant Agreement. This withdrawal reduced Growth Opportunity's ASAP account balance from approximately $154,973,935.78 as of August 1, 2025, to approximately $10,845,444.10 by August 31, 2025, representing the removal of nearly 90 percent of the grant funds previously obligated and disbursed to Growth Opportunity. A true and exact copy of ASAP Account Settlement Report Reflecting August 2025 Withdrawal of Grant Funds is attached as Exhibit G.

**Congress repeals Clean Air Act § 134 but rescinds only unobligated funds.**

57.    On July 3, 2025, Congress passed a budget reconciliation bill, H.R. 1. Pub. L. 119-21, 139 Stat. 72 (July 4, 2025). Section 60002 of H.R. 1 provides:

> Section 134 of the Clean Air Act (42 U.S.C. [§] 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

139 Stat. at 154.

58.     By its explicit terms, H.R. 1 rescinded only "the *unobligated* balances of amounts made available to carry out" section 134 of the Clean Air Act. *Id.*  Accordingly, any Greenhouse Gas Reduction Fund funds that *were* obligated as of July 3, 2025, were not rescinded. Plaintiff's funds were obligated well before July 3, 2025, and were, therefore, not rescinded by H.R. 1.

59.     Legislative history further underscores that H.R. 1 did not rescind any obligated funds and likewise did not end the Solar for All program created by those obligated funds.

60.     During the markup of the Energy and Commerce Committee title on H.R. 1 on May 13, 2025, Representative Morgan Griffith (R-Va.), then-Chair of the House Energy and Commerce Committee's Subcommittee on the Environment, stated:

> [T]hese provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances.  So if a grant was already given, as far as this bill is concerned, then that would still be going forward . . . If the grant has already been granted and the money is obligated, then  .  .  .   then our language does not affect that.   [W]e can't rescind expenditures that have already been obligated.

171 Cong. Rec. S4283–84 (July 9, 2025).

61.     Representative Brett Guthrie (R-Ky.), Chair of the House Energy and Commerce Committee likewise explained that H.R. 1 "does not close the grants on any obligated funds." *Id.* at S4284.

62.     The Budget Committee's Report on H.R. 1 stated that H.R. 1 "would decrease the federal deficit by approximately $104,934 as a result of repealing authorizations and rescinding unobligated funds that were appropriated to the U.S. Environmental Protection Agency (EPA) under the Inflation Reduction Act." Rep. No. 119-106(I), 119th Cong., 1st Sess., at 556 (May 20, 2025).  The small amount of deficit reduction envisioned further confirms that H.R. 1 did not rescind the $7 billion in funds already obligated for the entire Solar for All program.

63.     In the same report, the minority members agreed that "[t]he budgetary significance of" H.R. 1's "repeal [of] section 134 of the Clean Air Act and resci[ssion] [of] unobligated funds for the Greenhouse Gas Reduction Fund" was "questionable, as only $19 million is available out of the entire $27 billion appropriated.  This remaining money is allocated for administrative purposes." *Id.* at 627.

64.     After H.R. 1 was enacted, the CBO estimated that repealing the Greenhouse Gas Reduction Fund (Clean Air Act § 134) would reduce outlays by only about $19 million over Fiscal Year 2025 through Fiscal Year 2034, reflecting the repeal's effect on the Fund's remaining unobligated balances. *See* CBO, *Estimated Budgetary Effects of Public Law 119-21* (July 21, 2025), Title VI, § 60002 (Budget Authority –$19M; Outlays –$19M), https://www.cbo.gov/publication/61570.

65.     Upon information and belief, $19 million is approximately the remaining balance of the funds appropriated for EPA's administrative costs under 42 U.S.C. § 7434(a)(4).

66.     H.R. 1 also did not eliminate EPA's entire administrative budget. In its FY 2025 request, EPA specifically requested funds within the Environmental Programs and Management ("EPM") account "to support implementation of the Greenhouse Gas Reduction Fund under the Inflation Reduction Act." *See* EPA, *Fiscal Year 2025: Justification of Appropriation Estimates for the Committee on Appropriations*, Tab 05: Environmental Programs & Management (Mar. 2024) at 40, https://www.epa.gov/system/files/documents/2024-04/fy25-cj-05-epm.pdf (last visited Feb. 2, 2026). On March 15, 2025, Congress enacted the Full–Year Continuing Appropriations and Extensions Act, 2025 (Pub. L. No. 119-4),  appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" in fiscal year

2025, which was not touched by H.R. 1.  Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

**EPA unilaterally terminates Growth Opportunity's Grant Agreement.**

67. Beginning in August of 2025—one month after H.R. 1 was enacted—EPA terminated Growth Opportunity's Solar for All Grant Agreement.  EPA did so by sending Growth Opportunity a Termination Memorandum and another Assistance Amendment to its Solar for All Grant Agreement (hereinafter the "Termination Amendment").  A true and exact copy of the Termination Memorandum and the Termination Amendment is attached as Exhibits H and I, respectively.

68. In terminating Growth Opportunity's Grant Agreement, EPA committed a clear and material breach of the Grant Agreements entered between EPA and Growth Opportunity, which expressly limited the grounds for termination to three circumstances: (1) substantial noncompliance with the terms and conditions of the agreement that materially impairs performance, (2) adequate evidence of waste, fraud, or abuse, or (3) material misrepresentation of eligibility status.  None of those conditions were satisfied here.

69. The rationale for EPA's termination was expressed in a Termination Memorandum to Growth Opportunity, stating that it was terminating its Solar for All Grant Agreement. The Termination Memorandum asserted that EPA intended to terminate Growth Opportunity's Grant Agreement based on EPA's interpretation of H.R. 1.  *See* Ex. H [Growth Opportunity's Termination Memorandum (Aug. 7, 2025)] at 1.

70. The Termination Memorandum stated that "pursuant to the One Big Beautiful Bill Act (OBBBA)," EPA was "hereby terminating [Growth Opportunity's] Assistance Agreement." Ex. H [Growth Opportunity's Termination Memorandum  (Aug. 7, 2025)] at 1.

71.     The Termination Memorandum further asserted:

Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. [§] 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)–(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

*Id.*

72.     The Termination Memorandum further provided that the "process for closeout is generally outlined in 2 CFR [§] 200.344," and that the EPA would require certain closeout reports within 120 days of closeout. *Id.* at 1-2.

73.     The interpretation of H.R. 1 in the Termination Memorandum aligns with statements by EPA officials, including Administrator Lee Zeldin, that the Solar for All program was terminated because "[t]he One Big Beautiful Bill eliminated the Greenhouse Gas Reduction Fund." Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025 @ 2:07 p.m.), https://x.com/epaleezeldin/status/1953518426602803684.



74.    EPA's interpretation of H.R. 1 is contrary to the statutory text, which states explicitly that only "the unobligated balances of amounts made available to carry out [Section 134 of the Clean Air Act] (as in effect on the day before the date of enactment of this Act) [were] rescinded." 139 Stat. at 154. The legislative history of that provision further confirms that Congress rescinded only the approximately $19 million from the Greenhouse Gas Reduction Fund that had not yet been obligated and had been appropriated directly to EPA to support its costs in administering Greenhouse Gas Reduction Fund programs.

75.    EPA's erroneous interpretation of H.R. 1 is the only justification EPA has provided to Growth Opportunity for its decision to terminate the Growth Opportunity's Grant Agreement.

76.    In addition to the Termination Memoranda and the Zeldin social media post, EPA sent Growth Opportunity a Termination Amendment to its Solar for All Grant Agreement.

77.    The Termination Amendment states: "This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain

reporting requirements. Administrative terms and conditions are added." Ex. I [Growth Opportunity's Termination Amendment (Aug. 7, 2025)] at 1.

78. The Termination Amendment further states: "Per 2 CFR [§] 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions." *Id.*

79. The Termination Amendment further states: "The Agency is asserting its right under 2 CFR [§] 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR [§] 200.341." *Id.* at 4.

80. Under 2 C.F.R. § 200.340, a federal award "may be terminated in part or its entirety" in four circumstances: (1) by the federal agency if the recipient or subrecipient fails to comply with the terms and conditions of the award, (2) by all parties if they agree to terminate the award, (3) by the recipient or subrecipient upon sending notice of a reason to terminate the award, or (4) by the federal agency "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(1)-(4).

81. Section 200.340 also provides that a federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b). That is, unless the terms and conditions of the Federal award expressly state that the award can be terminated based on a change in agency priorities, that is not a lawful ground for termination even where the Federal award makes reference to Section 200.340. *Id*.

82.     The terms and conditions of each Federal award—contained in Growth Opportunity's Initial and Amended Grant Agreements—contain a termination provision that sets forth grounds for termination. The termination provision in the Amended Grant Agreement allows EPA "to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status." Ex. F [Growth Opportunity's Amended Grant Agreement (Jan. 6, 2025)] at 26.

83.     Therefore, the Grant Agreement clearly and unambiguously specifies only three bases for EPA's unilateral termination: (1) substantial noncompliance that materially impairs effective performance; (2) adequate evidence of waste, fraud, or abuse; or (3) material misrepresentation of eligibility status. *See* Ex. F [Growth Opportunity's Amended Grant Agreement (Jan. 6, 2025)] at 26.

84.     EPA has never alleged (nor could it) that Growth Opportunity is in substantial noncompliance with the terms and conditions of its Grant Agreement, that there is any evidence of waste, fraud, or abuse, or that Growth Opportunity has materially misrepresented its eligibility status.

85.     In terminating the Grant Agreement without satisfying the conditions provided in the termination clause, EPA therefore breached the Grant Agreement.

**Growth Opportunity timely submitted an administrative dispute to EPA.**

86.     The Termination Memorandum announcing the cancellation of Solar for All provided:

> If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR [§] 1500.15.

Ex. H [Growth Opportunity Termination Memorandum (Aug. 7, 2025)] at 2.

87. On August 28, 2025, Growth Opportunity timely submitted a dispute to EPA pursuant to Part 1500 and thereby challenged the termination of the Solar for All program and its individual Solar for All Grant Agreements. A true and exact copy of Growth Opportunity's Formal Dispute is attached as Exhibit J.

88. On September 22, 2025, EPA acknowledged Growth Opportunity's Formal Dispute via email. A true and exact copy of EPA's acknowledgment email to Growth Opportunity is attached as Exhibit K.

89. Although Growth Opportunity chose to submit an administrative dispute, neither its Grant Agreement nor applicable statutes or regulations require it to exhaust administrative remedies or otherwise obtain administrative decisions before an action in this Court.

90. Moreover, requiring Growth Opportunity to continue pursuing its administrative claim before litigating their Tucker Act claims would be futile, inadequate, and result in irreparable injury. *See Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F. 2d 90, 105-07 (D.C. Cir. 1986).

91. As of the date of this filing, EPA has not responded to or resolved the Growth Opportunity's Disagreement nor its Formal Dispute.

**EPA begins the closeout process for Solar for All Grant Agreement.**

92.     On or about October 1, 2025, EPA emailed Growth Opportunity with information about Closeout Instructions for the Solar for All Program.   A true and exact copy of the Closeout Instructions sent to Growth Opportunity is attached as Exhibit L.

93.     The Closeout Instructions provide that "[t]he award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition." *Id.* at 1.

94.     The Closeout Instructions further provide that "[m]oving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant." *Id.*

95.     The Closeout Instructions require that Growth Opportunity submit a Final Federal Financial Report to EPA "[w]ithin 120 calendar days of the end of the performance period (the date of termination that is listed in the award amendment)." *Id.*

96.     The Closeout Instructions do not mention Growth Opportunity's outstanding Disagreement or Formal Dispute with EPA.

97.     Growth Opportunity requested an extension of time in which to submit close out materials citing the on-going litigation related to the lawfulness of the terminations. EPA did not respond to Growth Opportunity's request.

98.     In an abundance of caution, Growth Opportunity submitted a Final Federal Financial Report on or about December 5, 2025, under protest. Specifically, Growth Opportunity put EPA on notice that it considered the closeout to be improper as the grant had been unlawfully and unilaterally terminated in direct contradiction of the terms and conditions of the grants as well

as controlling law. A true and exact copy of the Final Federal Financial Report is attached as Exhibit M.

99.    On April 15, 2026, Growth Opportunity—both under protest and in an abundance of caution—amended its Final Federal Financial Report that was filed approximately on December 5, 2025.  Like before, Growth Opportunity put EPA on notice that it considered the closeout to be improper as the grant had been unlawfully and unilaterally terminated in direct contradiction of the terms and conditions of the grants as well as controlling law.  Further, Growth Opportunity reserved its right to amend its financial report to the EPA after the conclusion of litigation to obtain additional payments in compliance with either any court order, any settlement with Growth Opportunity Partners, or any other circumstances that would result in additional payments by EPA. A true and exact copy of the Amended Final Federal Financial Report is attached as Exhibit N.

**EPA's actions harmed Growth Opportunity.**

100.    EPA has terminated Growth Opportunity's Grant Agreement, ordered Growth Opportunity to stop working, seized large sums of money from Growth Opportunity's ASAP account, and froze remaining balances in Growth Opportunity's ASAP account, all causing harm to Growth Opportunity.

101.    Within one week of terminating Growth Opportunity's Grant Agreement, EPA withdrew from Growth Opportunity's ASAP account approximately 90 percent of the money that had been awarded to Growth Opportunity.

102.    EPA's termination of the Grant Agreement and subsequent actions caused immediate and substantial financial harm to Growth Opportunity. Growth Opportunity's ASAP account reflected a balance of approximately $154,973,935.78 as of August 1, 2025. On or about August 8, 2025, EPA withdrew or authorized the withdrawal of approximately $144,102,757.27

from that account, leaving an ending balance of approximately $10,845,444.10 by August 31, 2025. *See* Ex. G [Growth Opportunity's ASAP Account Settlement Report Reflecting August 2025 Withdrawal of Grant Funds]. EPA effectuated this withdrawal without providing prior notice, explanation, or contractual justification, and without identifying the legal basis for the specific amount seized.

103.    EPA seized Growth Opportunity's grant money without notice, without reasoning, and without explanation for the amount of money taken.

104.    EPA restricted Growth Opportunity's use of the remaining grant money in their ASAP account to "allowable" costs for financial obligations incurred prior to the termination date. Ex. I [Growth Opportunity Termination Amendment (Aug. 7, 2025)] at 4.

105.    EPA's actions—including terminating Growth Opportunity's Grant Agreement and ordering Growth Opportunity to stop work—harm Growth Opportunity even beyond the loss of the funds awarded in the Grant Agreement.

106.    Growth Opportunity's program—funded through its $156,120,000 award and incorporated into the Grant Agreement through the January 6, 2025, Assistance Amendment—was structured to deploy residential solar, community-serving solar, associated storage, and enabling-upgrade financial assistance to low-income and disadvantaged communities throughout the Industrial Heartland region. By directing Growth Opportunity to stop work, freezing remaining funds, and withdrawing approximately 90% of Growth Opportunity's obligated award, EPA has made it impossible for Growth Opportunity to launch its planned rooftop-solar and community-solar financing activities, provide technical-assistance and project-deployment services, or deliver the energy-cost savings, resilience benefits, equitable-workforce development

opportunities, and other community benefits that the Solar for All program was established to achieve.

**CLAIMS FOR RELIEF**

**COUNT I**
**Breach of the Solar for All Grant Agreement**

107.    Growth Opportunity incorporates by reference the allegations contained in the preceding paragraphs.

108.    To recover for breach of contract, Growth Opportunity must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

109.    The Solar for All Grant Agreement is a binding contract that contemplates money damages.

110.    The Solar for All Grant Agreement was entered into by EPA officials with authority to bind the United States.

111.    EPA breached the express terms of Growth Opportunity's Grant Agreement by wrongfully terminating the Grant Agreement. EPA's Termination Memorandum identified no facts constituting substantial noncompliance, material impairment of performance, waste, fraud, abuse, or an eligibility-related misrepresentation as required by the Amended Grant Agreement.

112.    The Solar for All Grant Agreement contained a provision by which EPA agreed to make a specified amount of federal funds available to the Growth Opportunity for its Solar for All project, creating a concrete disbursement obligation that EPA breached.

113.    In the Amended Grant Agreement, EPA and Growth Opportunity mutually agreed to limit EPA's unilateral termination rights under 2 C.F.R. § 200.339 and 2 C.F.R. § 200.340 to situations involving substantial noncompliance that materially impairs performance, adequate evidence of waste, fraud, or abuse, or a misrepresentation of eligibility status. The Amended Grant Agreement did not grant EPA any broader termination authority, including any termination-for-convenience or "best interests" basis.

114.    Specifically, the termination provisions in Growth Opportunity's Amended Grant Agreement provides as follows:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, *when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status*, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination.

*See, e.g.,* Ex. E [Growth Opportunity's Amended Grant Agreement  (Jan. 6, 2025)] at 35-36 (emphasis added).

115.    Under the express terms of the Grant Agreement, EPA could therefore issue a unilateral termination based only on (1) substantial noncompliance that materially impairs performance, (2) evidence of waste, fraud, or abuse, or (3) a material misrepresentation of eligibility. EPA could not terminate the Grant Agreement on any other basis because the Grant Agreement did not incorporate by reference or expressly authorize EPA's right to termination under any other basis, including under any broader regulatory discretion.

116.    The bases for EPA's termination of Growth Opportunity's Grant Agreement did not include substantial noncompliance that materially impaired performance, evidence of waste, fraud, or abuse, or a material misrepresentation of eligibility status.

117. The termination provisions in the Grant Agreement did not allow EPA to issue unilateral termination on any other grounds. Accordingly, the United States is liable for breach of the agreement.

118. EPA's claim, in the termination notice, that it was forced to terminate the Agreement based on H.R. 1 does not absolve the United States from liability for breach.  Even a correct interpretation of H.R. 1 would not expand EPA's contractual termination rights, rather than a broader statement about congressional acts and liability.

119. EPA's breach of Growth Opportunity's Solar for All Grant Agreement has caused Growth Opportunity to suffer damages in an amount to be determined at trial.

## COUNT II
### Breach of the Duty of Good Faith and Fair Dealing

120. Growth Opportunity incorporates by reference the allegations contained in the preceding paragraphs.

121. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)) (other citation omitted).

122. The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

123. The Solar for All Grant Agreement is a binding contract that contemplates money damages.

124. The Solar for All Grant Agreement was entered into by EPA officials with authority to bind the United States.

125. The Solar for All Grant Agreement contained a provision by which EPA agreed to make a specified amount of federal funds available to the Growth Opportunity for its Solar for All project.

126. Growth Opportunity entered into the Grant Agreement with EPA with the reasonable expectation that EPA would comply with the terms of the Grant Agreements and that EPA would act in good faith and deal fairly with Growth Opportunity. These reasonable expectations included that EPA would not interfere with Growth Opportunity's performance, would not withhold or withdraw obligated funds without contractual basis, and would not impose conditions inconsistent with the Grant Agreement's terms.

127. EPA breached the Grant Agreement's implied duty of good faith and fair dealing. This breach was independent of and in addition to EPA's wrongful termination because EPA engaged in conduct that frustrated Growth Opportunity's performance and deprived it of the benefits of the Agreement even before and separate from the issuance of the termination notice.

128. EPA breached this implied duty by, among other things, targeting Growth Opportunity's Grant Agreement for unilateral termination based on an erroneous and bad faith interpretation of H.R. 1, directing Growth Opportunity to stop work under the Grant Agreement, withdrawing funds already awarded to Growth Opportunity (without prior notice or explanation), preventing Growth Opportunity from spending money already awarded to them, and imposing new terms and conditions on Growth Opportunity.

129. EPA's actions interfered with Growth Opportunity's performance under the Grant Agreement and destroyed Growth Opportunity's reasonable expectations regarding the fruits of its

Grant Agreement. EPA's conduct constituted an abuse of the discretion the Agreement afforded and frustrated the Grant Agreement's intended allocation of rights and benefits.

130.    Upon information and belief, EPA's actions were intended to interfere with Growth Opportunity's operation of the Solar for All program despite lacking any legal authority to do so. EPA's directives to halt performance, withdrawal of previously awarded funds, and imposition of extra-contractual conditions collectively evidence improper purpose inconsistent with the implied covenant.

131.    EPA's actions caused Growth Opportunity to suffer substantial damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Growth Opportunity prays that this Court enter judgment against the United States as follows:

    i.    Awarding money damages to Growth Opportunity in an amount to be determined at trial;

    ii.    Awarding any allowable pre- and post-judgment interest;

    iii.    Awarding Growth Opportunity its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

    iv.    Granting other such relief as this Court may deem proper.

Dated:  May 11, 2026                Respectfully submitted,

                                        SEYFARTH SHAW LLP

                                        By: /s/ Edward V. Arnold
                                           Edward V. Arnold

SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC  20004
Telephone:  (202) 463-2400
Facsimile:   (202) 828-5393
Email:  earnold@seyfarth.com

*Counsel of Record for Plaintiff*
*Growth Opportunity Partners*

*Of Counsel:*

Zachary F. Jacobson
SEYFARTH SHAW LLP
975 F Street NW
Washington, DC  20004
zjacobson@seyfarth.com


By: */s/ Jennifer Whitfield*
    Jennifer Whitfield
    Kimberley Hunter
    Southern Environmental Law Center
    136 E. Rosemary St., Suite 500
    Chapel Hill, NC 27514
    Telephone: (919) 967-1450
    Facsimile: (919) 347-929-9421
    jwhitfield@selc.org
    kmeyer@selc.org

*Co-Counsel for Plaintiff*
*Growth Opportunity Partners*


By: */s/ Gary DiBianco*
    Gary DiBianco
    Lawyers for Good Government
    6218 Georgia Avenue NW, # 5001
    Washington, D.C. 20011
    Telephone: (202) 258-6826
    Gary@lawyersforgoodgovernment.org

*Co-Counsel for Plaintiff*

*Growth Opportunity Partners*