No. 26-691
(Senior Judge Eric Bruggink)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

GROWTH OPPORTUNITY PARTNERS,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

**DEFENDANT'S MOTION TO DISMISS**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

MARTIN HOCKEY, JR.
Deputy Director

JULIA S. MARCH
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 598-7383

Attorneys for Defendant

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 2

I. Greenhouse Gas Reduction Fund and Solar for All ........ 2

II. Grant Regulations ........ 2

III. Grant Agreement ........ 3

IV. Congress Repeals Section 134 and EPA Terminates the Grant Agreements ........ 5

V. Procedural History ........ 6

ARGUMENT ........ 6

I. Standards Of Review ........ 6

A. Motion To Dismiss For Failure To State A Claim ........ 6

II. Growth Opportunity Fails to State a Plausible Illegal Exaction Claim ........ 7

III. Growth Opportunity Fails to State a Claim for an Unconstitutional Taking ........ 11

CONCLUSION ........ 14

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Acceptance Ins. Cos., Inc. v. United States*,
583 F.3d 849 (Fed. Cir. 2009) ........................................ 11

*Andres v. United States*,
2005 WL 6112616 (Fed. Cl. July 28, 2005)........................................ 8

*Arizona v. United States*,
494 F.2d 1285 (Ct. Cl. 1974) ........................................ 13

*Callaway Manor Apts., Ltd. v. United States*,
136 Fed. Cl. 313 (2018) ........................................ 14

*Clear Creek Cmty. Servs. Dist. v. United States*,
132 Fed. Cl. 223 (2017) ........................................ 12

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) ........................................ 11, 13

*Dep't of Nat. Res. v. United States*,
227 Ct. Cl. 552 (1981) ........................................ 13

*Dimare Fresh, Inc. v. United States*,
808 F.3d 1301 (Fed. Cir. 2015) ........................................ 7

*Eastport S.S. Corp. v. United States*,
372 F.2d 1002 (Ct. Cl. 1967) ........................................ 8

*Kania v. United States*,
650 F.2d 264 (Ct. Cl. 1981) ........................................ 13

*LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ........................................ 7

*Lummi Tribe of the Lummi Rsrv., Washington v. United States*,
870 F.3d 1313 (Fed. Cir. 2017) ........................................ 8

*Nat'l Veterans Legal Servs. Program v. United States*,
968 F.3d 1340 (Fed. Cir. 2020) ........................................ 8

*PGB Hanger, LLC v. United States*,
170 Fed. Cl. 473 (2024) ........................................ 12

*Piszel v. United States*,
121 Fed. Cl. 793 (2015) ........................................ 8

*Piszel v. United States*,
833 F.3d 1366 (Fed. Cir. 2016) ........................................ 9, 10, 12, 14

*Rocky Mt. Helium, LLC v. United States*,
841 F.3d 1320 (Fed. Cir. 2016) ........................................ 7

*State of Texas v. United States*,
537 F.2d 466 (Ct. Cl. 1976) ........................................ 13

*Sun Oil Co. v. United States*,
572 F.2d 786 (Ct. Cl. 1978) ........................................ 12

*Taino Constr. Grp., LLC v. United States*,
177 Fed. Cl. 730 (2025) ........................................ 7

*Virgin Islands Port Auth. v. United States*,
922 F.3d 1328 (Fed. Cir. 2019) ........................................ 8

*Westfed Holdings, Inc. v. United States*,
52 Fed. Cl. 135 (2002) ........................................ 10

**Statutes**

Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025) ........................................ 5

**Rules**

RCFC 12(b)(6) ........................................ 6, 7

**Regulations**

2 C.F.R. 33 ........................................ 3

2 C.F.R. 200.305(b)(13) ........................................ 10

2 C.F.R. 200.344 ........................................ 11

2 C.F.R. 1500 ........................................ 3, 9

2 C.F.R. Part 200 ........................................ 2, 3, 9

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| GROWTH OPPURTUNITY PARTNERS,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 26-691<br>Senior Judge Bruggink |

**DEFENDANT'S PARTIAL MOTION TO DISMISS**

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss Counts III and IV of the complaint filed by plaintiff, Growth Opportunity Partners, for failure to state a claim.

**INTRODUCTION**

The fatal flaw of Counts III (illegal exaction) and IV (unconstitutional taking) in plaintiff's complaint is they assert a Fifth Amendment claim over monies covered by its grant agreement. The Federal Circuit has recognized grants may be creatures of contract. As such, traditional principles with respect to Fifth Amendment claims as they relate to contractual suits apply. These principles foreclose both claims—even though they are pled alternatively.

With respect to its illegal exaction claim, the Federal Circuit has previously held that grant monies come with strings attached, and those strings make a grant recipient's interest in its grant funds a contingent interest. Because Environmental Protection Agency (EPA) provided these funds to Growth Opportunity conditionally based on the terms of the grant agreement, it fails to state a claim for illegal exaction. Plaintiff's takings claim is similarly deficient, as the complaint alleges taking of monies provided pursuant to the terms of a grant agreement.

Because plaintiff's right to these funds rises and falls with the grant agreement, dismissal of these claims is appropriate.

## STATEMENT OF THE ISSUES

1. Whether Growth Opportunity fails to state a claim for illegal exaction because it only has a contingent interest in the allegedly exacted funds.

2. Whether Growth Opportunity fails to state a claim under the Takings Clause of the Fifth Amendment where its interactions with the Government were based solely on a freely negotiated contractual arrangement.

## STATEMENT OF THE CASE[1]

### I. Greenhouse Gas Reduction Fund and Solar for All

In 2022, Congress added Section 134 to the Clean Air Act, which appropriated $26.97 billion to the EPA Administrator for a "Greenhouse Gas Reduction Fund." Dkt. 15 ¶ 24. Of that total, Congress appropriated $7 billion to EPA to make grants to states and other eligible recipients to carry out "greenhouse gas emission reduction activities." *Id.* ¶ 45. In 2023, EPA announced a funding opportunity, titled Solar for All. *Id.* ¶ 30; *see also* Dkt. 15-1 at 6 (stating statutory authority is Section 134 of the Clean Air Act). EPA subsequently selected 60 grant recipients, including plaintiff, to receive Solar for All funding. Dkt. 15 ¶ 39.

### II. Grant Regulations

EPA's grant agreement with plaintiff was "subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments." Dkt. 15-6 at 2. The applicable regulations include 2 C.F.R. Part 200, Uniform Administrative

---

[1] The below statement of the case relies on the facts alleged in plaintiff's first amended complaint, Dkt. 15, accepted as true for purposes of this motion, and relies on those documents attached thereto.

Requirements, Cost Principles, and Audit Requirements for Federal Awards, which govern federal grants ("Uniform Guidance"). *See*, *e.g.*, 2 C.F.R. §§ 200.100, 200.101(a); Dkt. 15-6 at 3 (citing 2 C.F.R. 200, 2 C.F.R. 1500, and 2 C.F.R. 33). EPA's grant regulations at 2 C.F.R. Part 1500 adopt and supplement the uniform guidance in 2 C.F.R. Part 200. *See* 2 C.F.R. § 1500.2.

The Uniform Guidance covers the full lifecycle of a grant—from pre-award to termination and closeout—and sets forth extensive cost principles and audit requirements applicable to Federal grants. 2 C.F.R. Part 200, Subparts B, C, D, E, F. Plaintiff's grant agreement provided that "[a]ll costs charged to the award to support [allowable activities] must meet the requirements for allowability under 2 C.F.R. Part 200, Subpart E as well as applicable provisions of 2 C.F.R. Part 1500." Dkt. 15-6 at 18.

**III. Grant Agreement**

The Solar for All grant agreements provide that EPA would "cost-share 100.00% of all approved budget period costs incurred" by plaintiff, "up to and not exceeding total federal funding of $ 156,120,000.00." Dkt. 15-6 at 2. That cost share, and approval of costs incurred, was expressly "subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments." *Id*. The grant agreement covered a five-year period of performance. *Id.*

In exchange, plaintiff agreed to, for example, (1) "comply with the statutory requirements of Section 134 of the Clean Air Act," *id.* at 26; (2) "comply with the current EPA general terms and conditions," *id.* at 5; (3) submit "transaction and project-level reporting" "in accordance with information collection instruments approved through GGRF [Greenhouse Gas Reduction Fund] Accomplishment Reporting," *id.* at 13; (4) develop an EPA-approved "Quality Management Plan," *id.* at 15; (5) develop an EPA-approved "Quality Assurance Project Plan,"

*id.* at 16; and (6) adhere to the grant regulations within 2 C.F.R. Parts 200 and 1500, *see*, *e.g.*, *id.* at 18. Plaintiff also "agree[d] to implement this grant in accordance with its EPA-approved Solar for All Workplan." *Id*. at 17; *see also* Dkt. 15 ¶ 42.

The agreement gave EPA an "[o]versight and [m]onitoring" role "to ensure that eligible [r]ecipients effectively carry out the significant scale, complexity, and novelty of the Solar for All Program." Dkt. 15-6 at 31. Those oversight and monitoring activities included, among other things, (1) "[p]articipating in project activities," (2) "[r]eviewing the qualifications of key personnel," (3) "[c]losely monitoring the [r]ecipient's management and oversight of [s]ubrecipients and procedures," (4) "[c]losely monitoring the recipient's performance," (5) "[r]eviewing and commenting on performance reports," and (6) "[v]erifying that the [r]ecipient is expending the award on allowable activities." *Id*.

The grant agreement also incorporated by reference standard terms and conditions. Dkt. 15-6 at 5; *see also General Terms and Conditions,* Envir. Protect. Agency, Oct. 1, 2024, https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf.

Both the terms and conditions and regulations describe how monies were to be disbursed and place parameters on the recipient's drawdown of the funding, including that:

- Recipients must enroll in the Automated Standard Application for Payments (ASAP) to receive funds under the agreement unless granted an exception;
- "the recipient must draw funds from ASAP only for the minimum amounts needed for actual and immediate cash requirements to pay employees, contractors, subrecipients or to satisfy other obligations for allowable costs under this assistance agreement;"
- "Any EPA funds subject to this paragraph that remain undisbursed after 5 business days must be fully disbursed within 15 business days of draw down or be returned to EPA";
- A recipient must return funds drawn down in excess; and more.

*General Terms and Conditions,* Envir. Protect. Agency, p. 4, Oct. 1, 2024, p. 3-4, https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf.

**IV. Congress Repeals Section 134 and EPA Terminates the Grant Agreements**

On July 4, 2025, less than one year into the five-year Solar for All grants, Congress "repealed" Section 134—the provision that authorized the Greenhouse Gas Reduction Fund, including Solar for All—and "rescinded" all "unobligated balances of amounts made available to carry out that section." Dkt. 15 ¶ 57 (quoting Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025)).

EPA subsequently terminated Solar for All grants in August 2025. *Id.* ¶ 67. EPA explained that Congress's repeal of Section 134 "repeals the underlying authority for the Solar for All Program," such that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients." Dkt. 15-8 at 2. As such, EPA issued a termination amendment. Dkt. 15-9.

EPA explained that, given "the early nature" of any expenditures made in just the first year of the five-year grant agreements, EPA "expect[s] any harms to interests suffered to be remedied and remediable by the close out process[]." Dkt. 15-8 at 2; *see also* Dkt. 15-6 at 26 (providing that "costs during suspension or after termination are allowable" pursuant to the regulations). EPA confirmed that, through the closeout process, each grant recipient would be entitled to "allowable costs incurred up to the date of [termination]," certain costs incurred "after this termination," and "reasonable and necessary costs" incurred to close out their grant. Dkt. 15-8 at 2.

## V. Procedural History

Plaintiff brought its complaint alleging breach of contract and breach of the duty of good faith and fair dealing on May 11, 2026. Dkt. 1. On August 26, 2026, plaintiff moved to amend its complaint to add two Fifth Amendment claims. Dkt. 11. In tandem, defendant moved unopposed for an extension of time to respond to the amended complaint, Dkt. 10, and the Court granted the motions on August 27, 2026, Dkt. 12. Plaintiff filed its first amended complaint on August 28, 2026, and a corrected version of it on September 3, 2026, per the Court's order, Dkt. 14. Dkt. 15.

# ARGUMENT

## I. Standards Of Review

### A. Motion To Dismiss For Failure To State A Claim

A party may assert by motion the defense of "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under this standard, a party's pleading must contain factual allegations that establish "more than a sheer possibility that a defendant has acted unlawfully" or a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements." *Id.* To this end, it is well settled that a complaint should be dismissed pursuant to Rule 12(b)(6) "when the facts asserted by the [plaintiff] do not entitle [them] to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

In deciding a Rule 12(b)(6) motion, the Court generally "must presume that the facts are as alleged in the complaint[] and make all reasonable inferences in favor of the plaintiff." *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009). The Court, however, is not required to

accept legal conclusions asserted in the complaint. *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019). Nor is the Court required to accept as true "allegations that contradict matters properly subject to judicial notice or by exhibit." *Terry v. United States*, 103 Fed. Cl. 645, 652 (2012) (quotation marks and citation omitted). The Court's review is thus "not limited to the four corners of the complaint." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015).

Accordingly, in addition to "consider[ing] the complaint in its entirety," including "documents incorporated into the complaint by reference, and matters of which [the] court may take judicial notice," *Rocky Mt. Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016), the Court may also look to "matters . . . integral to the claim[s]" in the complaint when deciding a Rule 12(b)(6) motion, *Dimare Fresh, Inc.*, 808 F.3d at 1306; *see, e.g.*, *Bristol Bay Area Health Corp. v. United States*, 110 Fed. Cl. 251, 261–62 (2013). In addition to the complaint, the Court may also consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (brackets in the original). In the event the allegations in the complaint "contradict matters properly subject to judicial notice or by exhibit," the exhibit prevails. *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017); *see Taino Constr. Grp., LLC v. United States*, 177 Fed. Cl. 730, 739-40 (2025).

## II. Growth Opportunity Fails to State a Plausible Illegal Exaction Claim

As an alternative to its breach-of-contract theory, plaintiff alleges that EPA's "withdr[awal] [of] approximately $144,102,757.27 from plaintiff's ASAP account" constituted an illegal exaction. Dkt. 15 ¶ 139. Plaintiff fails to state an illegal exaction claim because Growth Opportunity only had a contingent interest in these funds.

An illegal exaction occurs when the plaintiff has paid money to the government and it seeks return of that money which was "improperly ... taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Virgin Islands Port Auth. v. United States*, 922 F.3d 1328, 1333 (Fed. Cir. 2019) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)). The essence of an illegal exaction is when "the Government has the citizen's money in its pocket." *Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1348 (Fed. Cir. 2020) (internal quotation marks omitted). "[W]hat distinguishes an illegal exaction from a back pay or breach of contract claim, is that in an illegal exaction case the claimant has paid money over to the Government that he once had in his pocket, and in a back pay or breach of contract claim the claimant is seeking payment of money the claimant has never received." *Andres v. United States*, 2005 WL 6112616, at *3 (Fed. Cl. July 28, 2005); *accord Piszel v. United States*, 121 Fed. Cl. 793, 802 (2015), *aff'd*, 833 F.3d 1366 (Fed. Cir. 2016) (stating that "[b]ecause plaintiff cannot show that he has paid any money to the government directly or 'in effect,' he fails to state a plausible illegal exaction claim in the complaint."). As the Federal Circuit has stated "[a]n illegal exaction claim must be based on property *taken* from the claimant, not property left *unawarded* to the claimant." *Lummi Tribe of the Lummi Rsrv., Washington v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017). "[F]ailure to disburse property that was never in the claimant's possession or control [cannot] constitute[] an exaction." *Id.* Further, a plaintiff cannot state an illegal exaction claim where it is provided grant monies on a contingent basis. *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1349 (Fed. Cir. 2021) (affirming motion to dismiss illegal exaction claim in context of FEMA agreement for disaster assistance). There is no illegal exaction claim when '"money is 'prevented from coming into

plaintiff's account.'" *Piszel*, 833 F.3d at 1382 (quoting *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 153 (2002) (brackets omitted).

Plaintiff's claim in its simplest form asserts that once EPA deposited grant monies into an ASAP account, it became plaintiff's money. Dkt. 15 ¶ 135-36. However, the grant agreement, attached to plaintiff's complaint as Exhibit F (Dkt. 15-6), contains numerous contingencies that are fatal to plaintiff's claim. As an initial matter, a grant recipient could only draw down funds for "actual and immediate cash requirements to pay employees, contractors, subrecipients or to satisfy other obligations." *General Terms and Conditions,* Envir. Protect. Agency, p. 4, Oct. 1, 2024, p. 3-4. Moreover, the grant recipient faced restrictions on the costs it could incur both in regulation and under the grant agreement. *See* Dkt. 15-6 at 2 ("This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments"); *id.* at 18 ("All costs charged to the award to support these activities must meet the requirements for allowability under 2 C.F.R. Part 200, Subpart E as well as applicable provisions of 2 C.F.R. Part 1500."). The grant agreement also contained numerous monitoring requirements, labor law compliance provisions, auditing requirements, and more. *See generally id.* at 20-23 . Regarding ASAP accounts, the grant agreement required plaintiff "to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period." *Id.* at 26. Additionally, EPA's standard terms and conditions—incorporated into this grant agreement—not only contain a mechanism by which EPA reviews drawdowns but demonstrate the clearinghouse nature of ASAP accounts. *Id.* at 5 ("The Recipient agrees to comply with the current EPA General Terms and Conditions."). Specifically:

> the recipient initiates an electronic payment request online via ASAP, which is approved or rejected based on the amount of available funds authorized by EPA in

> the recipient's ASAP account. Approved payments are credited to the account at the financial institution of the recipient organization set up by the recipient during the ASAP enrollment process. . . . Any EPA funds subject to this paragraph that remain undisbursed after 5 business days must be fully disbursed within 15 business days of draw down or be returned to EPA.

*General Terms and Conditions,* Envir. Protect. Agency, p. 3-4, Oct. 1, 2024, https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf. In sum, EPA not only maintained extensive control and oversight over the ASAP accounts but retained the right to have funds returned in some circumstances. *See, e.g.,* 2 C.F.R. 200.305(b)(13). Plaintiff acknowledges in its complaint these numerous conditions. Dkt. 15 ¶ 42 ("Growth Opportunity also agreed to be subject to an array of administrative and programmatic requirements."). This is fatal to its claim. *Columbus Reg'l Hosp.*, 990 F.3d at 1349 ("Columbus never had an unconditional interest in the disputed funds in this case, because FEMA expressly reserved the right to recover those funds for certain reasons within a specific period of time.").

Moreover, as these Terms and Conditions emphasize, the most plaintiff could allege occurred was that money was prevented from going into its own bank account. Because of this, there is no illegal exaction. *Piszel*, 833 F.3d at 1382 ("no illegal exaction where money is 'prevented from coming into [a] plaintiff's account'") (quoting *Westfed Holdings, Inc. v*, 52 Fed. Cl. at 153).

The cost regulations further emphasize the contingent nature of these funds. Cost regulations require that costs must be "incurred," "allowable," "reasonable," and "allocable," as extensively detailed in the regulations. *E.g.*, 2 C.F.R. §§ 200.100, 200.343, 200.403, 200.404, 200.405. Thus, the agreements and incorporated regulations promise to reimburse certain

categories of incurred costs not to exceed the grant's value, contingent upon meeting certain standards including allowability, allocability, and reasonableness. These are the precise "strings" the Federal Circuit found fatal to an illegal exaction claim in *Columbus Regional Hospital*.

The fact that these monies were deposited into an ASAP account designated for plaintiff does not change the contingent nature of plaintiff receiving these funds. Numerous strings are attached to these grant monies, and EPA retained extensive control over and oversight of these grants even beyond termination through the closeout process. 2 C.F.R. 200.344. Because of this, plaintiff cannot show a vested property interest in monies that remained in its ASAP account and fails to state a claim.

## III. Growth Opportunity Fails to State a Claim for an Unconstitutional Taking

Growth Opportunity's complaint alleges that "EPA's withdrawal and restriction of Growth Opportunity's funds constituted a taking of private property for public use within the meaning of the Fifth Amendment." Dkt. 15 ¶ 146. This claim fails because plaintiff's right to monies in an ASAP account does not exist independent of its grant agreement.

Under the Fifth Amendment, no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. In evaluating whether governmental action constitutes a taking for Fifth Amendment purposes, the court must determine "whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). When a claimant lacks such a property interest, nothing has been taken, and thus the claimant cannot maintain a takings claim. *See Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). When entering contracts, "'the Government acts in its commercial or proprietary capacity ..., rather than its sovereign capacity' and therefore the

'remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights.'" *Piszel,* 833 F.3d at 1376 (quoting *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001)). An allegation of "interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978) (citations omitted). "'[W]hen a party believes the government has interfered with its property rights in the context of a government contract, it must seek recourse for the alleged wrong 'in contract rather than under a takings claim.'" *PGB Hanger, LLC v. United States*, 170 Fed. Cl. 473, 481 (2024) (quoting *Piszel*, 833 F.3d at 1376) (dismissing takings claim pled in the alternative for failure to state a claim). While parties are not "categorically precluded from alleging takings claims in the alternative, takings claims in the government contract context are only viable when 'the right at issue is not governed by the terms of the parties' contract' or when [based on] 'rights that arise independently from the contract[.]'" *Id.* (quoting *Allegre Villa, Ltd. P'ship v. United States*, 60 Fed. Cl. 11, 18 (2004)). In short, this Court looks to the origin of the at-issue right. If it is created by the terms of a contract, a takings claim is not viable. *Clear Creek Cmty. Servs. Dist. v. United States*, 132 Fed. Cl. 223, 262-63 (2017).

That is the case here. Although much of this Court's precedent on this issue relates to procurement type contracts, the reasoning applies to the grant agreements at issue in this litigation. The sole property right plaintiff alleges—money deposited in an ASAP account that was subject to EPA control and oversight—is fatal to its takings claim. To review, the complaint alleges plaintiff has a property interest in "funds awarded, obligated, and made available to Growth Opportunity through an ASAP account," Dkt. 15 ¶ 143, and the "withdrawal and restriction" of funds from that account which it had the "right to access and use . . . for the

purposes authorized by the Grant Agreement and EPA-approved workplan." Dkt. 15 ¶ 145. Plaintiff has not alleged any other basis for an interest in monies housed in an ASAP account outside of its grant. The Federal Circuit and its predecessor courts have long treated federal grant agreements as contracts. *See Columbus Reg'l Hosp.,* 990 F.3d at 1338 (citing *San Juan City Coll. v. United States*, 391 F.3d 1357, 1360–62 (Fed. Cir. 2004); *State of Texas v. United States*, 537 F.2d 466 (Ct. Cl. 1976); *Dep't of Nat. Res. v. United States*, 227 Ct. Cl. 552, 554 (1981); *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981); and *Arizona v. United States*, 494 F.2d 1285, 1287–88 (Ct. Cl. 1974)). Because plaintiff's complaint only alleges a taking of monies bestowed on it as a creature of its contract with the defendant, its claim for a taking fails.

The nature of ASAP accounts highlights plaintiff's lack of property interest in these funds. The Treasury Financial Manual defines ASAP as a "recipient-initialized payment and information system, designed to provide a single point of contact for the request and delivery of **federal funds.**" *Glossary*, Tres. Fin. Experience, https://tfx.treasury.gov/glossary (last visited Sept. 29, 2026) (emphasis added); *see also* 1 TFM 4A Chap. 3000 Sec. 3020 (incorporating glossary definition of ASAP Accounts). The Bureau of the Fiscal Service within the Department of Treasury administers ASAP accounts. *Automated Standard Application for Payments*, Bur. Fis. Serv., https://fiscal.treasury.gov/payments-from-government/automated-standard-application-for-payments-asap (last visited Sept. 29, 2026). Once an institution enrolls an ASAP account, it enables that institution to receive federal funds into its own bank account by ACH or wire. 1 TFM 4A, Chap. 3000, Sec. 30115. Put another way, ASAP acts as a clearinghouse for certain appropriations from the federal government to private parties. Only after a private party initiates a request does money move out of a Department of Treasury account to a private institution via ACH or wire. *Id.* In short, plaintiff cannot state a claim for a taking because the

only reason it has an ASAP account is to request transfer of federal funds to its account as it performs its obligations under the grant agreement. Accordingly, any dispute over the entitlement, timing or availability of those funds implicates the contract relationship itself, not any Fifth Amendment taking concern.

Plaintiff also has not alleged a taking of a contractual right—only a taking in "funds" from its ASAP Account. Dkt. 15 ¶ 18; *see also id.* ¶ 143 (stating its interest was in "funds awarded"); ¶ 146 (alleging the "withdrawal . . . of . . . funds constituted a taking"). However, should the Court read plaintiff's complaint to allege such a taking of a right, that claim fails as well. "[T]o effect a taking of a contractual right when performance has been prevented, the government 'must substantially take away the right to damages in the event of a breach.'" *Callaway Manor Apts., Ltd. v. United States*, 136 Fed. Cl. 313 (2018), *aff'd in part, vacated in part, rev'd in part*, 940 F.3d 650 (Fed. Cir. 2019) (quoting *Piszel,* 833 F.3d at 1377). Plaintiff has failed to allege the government has prevented it from seeking damages either through administrative closeout processes or an action in this Court. *Callaway Manor Apts., Ltd. v. United States*, 940 F.3d 650, 661 (Fed. Cir. 2019) (finding no taking of a contract right where "the Government has done nothing to try to prevent Appellants from seeking damages").

In short, plaintiff only alleges a right to funds in an ASAP account. Those funds are governed by the terms of its grant agreement. Because plaintiff alleges in the other counts of the complaint that it is entitled to monies provided to it by virtue of its contractual relationship with the United States, its takings claim fails.

## CONCLUSION

For these reasons, the Government respectfully requests that the Court dismiss counts III and IV of Growth Opportunity's complaint for failure to state a claim.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

MARTIN HOCKEY, JR.
Deputy Director

s/ Julia S. March
Julia S. March
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 598-7383
Email: Julia.S.March@usdoj.gov

October 13, 2026

Attorneys for Defendant