**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

GROWTH OPPORTUNITY PARTNERS,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Case No. 26-691
Senior Judge Eric G. Bruggink

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**


I. Relevant Factual and Procedural Background ..... 5

II. Standard of Review ..... 6

III. Argument ..... 7

A. Growth Opportunity's Alternative Illegal Exaction Claim Should be Allowed to Proceed. ..... 7

i. Growth Opportunity's Interest in the Obligated Funds Was Not Contingent. ..... 7

ii. The Terms and Conditions Confirm That the EPA Removed an Existing Authorization, Rather Than Merely Prohibiting a Transfer from an ASAP Account to a Commercial Bank Account. ..... 10

iii. The Cost Regulations Do Not Impose the Type of Recovery "Strings" That Controlled in Columbus Regional Hospital. ..... 12

B. Growth Opportunity's Alternative Unconstitutional Taking Claim Should Be Allowed to Proceed. ..... 16

i. Growth Opportunity Plausibly Alleges that It Has a Cognizable Property Interest in the Obligated Solar for All Funds Distinct from its Contractual Rights Under the Grant Agreement. ..... 17

ii. The Government's Hypothetical Growth Opportunity Contractual Right Takings Claim Does Not Foreclose Its Alternative Fifth Amendment Taking Claim. ..... 21

IV. Conclusion ..... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aerolineas Argentinas v. United States*,
77 F.3d 1564 (Fed. Cir. 1996)....7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....6, 7

*Aviation & Gen. Ins. Co., Ltd. v. United States*,
121 Fed. Cl. 357 (2015)....6, 18, 20

*Barlow & Haun, Inc. v. United States*,
87 Fed. Cl. 428 (2009)....4, 17, 21

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....6, 7

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021)....8, 12, 13

*Consol. Edison Co. of N.Y. v. United States*,
67 Fed. Cl. 285 (2005)....4, 17, 21, 22

*Harris Cnty., Texas v. United States Env't Prot. Agency*,
No. 25-CV-3646 (TSC), 2026 WL 2837849 (D.D.C. Sept. 22, 2026)....22

*Integrated Logistics Support Sys. Int'l, Inc. v. United States*,
42 Fed. Cl. 30 (1998)....3, 17

*Kam-Almaz v. United States*,
682 F.3d 1364 (Fed. Cir. 2012)....7

*Modern Sportsman, LLC v. United States*,
181 Fed. Cl. 746 (2026)....8

*PGB Hanger, LLC v. United States*,
170 Fed. Cl. 473 (2024)....6

*Piszel v. United States*,
833 F.3d 1366 (Fed. Cir. 2016)....8

*Stockton E. Water Dist. v. United States*,
583 F.3d 1344 (Fed. Cir. 2009)....3, 17

*Westfed Holdings, Inc. v. United States*,
52 Fed. Cl. 135 (2002) ....................3, 17

**Regulations**

2 C.F.R. § 200.100(c)....................13, 15

2 C.F.R. § 200.343(a)–(b)....................14

2 C.F.R. § 200.403(a)–(g)....................13

2 C.F.R. § 200.404....................13

2 C.F.R. § 200.405(a), (c)....................14

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

Defendant, the United States, asks the Court to decide too much, too soon. The Government does not move to dismiss Growth Opportunity Partners, Inc.'s ("Growth Opportunity") contract claims for breach of contract (Count I) and breach of the duty of good faith and fair dealing (Count II). Instead, the Government seeks to dismiss Growth Opportunity's alternative claims for illegal exaction (Count III) and a Fifth Amendment taking (Count IV) by asking the Court to assume the very proposition those claims place in dispute. According to the Government, the Environmental Protection Agency's ("EPA") decrease of $144,102,757.27 from Growth Opportunity's Automated Standard Application for Payments ("ASAP") authorization cannot constitute an illegal exaction or taking because Growth Opportunity had no cognizable interest in that authorization or, at most, held a contingent interest subject to the EPA's continuing control.

The Government's assumption is premature. Whether Growth Opportunity possessed a cognizable interest in the obligated funds, and whether the EPA retained authority to withdraw them under the circumstances alleged, are legal and factual questions that cannot be resolved in the Government's favor at this stage. The central question is whether Growth Opportunity's First Amended Complaint ("FAC") plausibly stated its illegal exaction and Fifth Amendment taking claims. Growth Opportunity did so, on both counts.

This dispute arises from the following facts: On July 12, 2024, the EPA awarded Growth Opportunity a $156.12 million Solar for All grant. FAC ¶ 2, ECF No. 15. The award covered an approved project running from May 1, 2024, through April 30, 2029. Ex. F at 1, ECF No. 15-6. Thereafter, the EPA entered into a binding Grant Agreement, obligated the funding by October 25, 2024, and made the full grant amount available through Growth Opportunity's ASAP account. FAC ¶¶ 3–4. On January 6, 2025, the EPA amended the Grant Agreement, which limited the EPA's

termination rights to "only" three specified circumstances: materially impairing noncompliance, adequate evidence of waste, fraud, or abuse, or material misrepresentation of eligibility. *Id.* ¶¶ 50–54, 82–85; Ex. F at 26. The EPA invoked none of the permitted circumstances; instead, the EPA terminated the award on the stated belief that subsequent legislation eliminated its statutory authority and appropriations. FAC ¶¶ 67–75; Ex. H at 1, ECF No. 15-8. The EPA then entered an authorization decrease of $144,102,757.27, leaving a balance of $10,845,444.10. FAC ¶¶ 56, 102; Ex. G at 1, ECF No. 15-7.

Those allegations answer the Government's motion on Count III. The Government characterizes Growth Opportunity's interest as contingent because access to and use of the award remained subject to statutory, regulatory, cost, monitoring, auditing, and drawdown requirements. Def.'s Mot. to Dismiss ("Mot.") at 7, 9–11, ECF No. 16. The FAC plausibly alleges something different: a completed award, an obligation of identified funds, an ASAP authorization for those funds, and the EPA's later decrease of that authorization on a ground Growth Opportunity alleges lacked statutory, regulatory, and contractual support. FAC ¶¶ 2–4, 50–56, 67–75, 102, 132–39. Whether the award, obligation, and ASAP authorization created a cognizable monetary interest, and whether the EPA had authority to remove that authorization on the ground invoked, turn on the governing award documents, regulations, and operation of ASAP. The incorporated materials do not foreclose Growth Opportunity's theory at the pleading stage. Nor should the Court assume that the EPA possessed the asserted authority when the FAC alleges that Exhibit F confined unilateral termination to circumstances the EPA did not invoke. FAC ¶¶ 51–54, 68–75, 82–85; Ex. F at 26. The Motion should therefore be denied.

Count IV should also survive dismissal. The Government asserts Count IV is foreclosed because the property interest originates in contract. But takings claims are not foreclosed simply

because the claim originates from a contractual relationship if "the scope of the alleged taking differs from the scope of the contract." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 152 (2002); *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed. Cl. 30, 34 (1998) ("That the circumstances confronting plaintiff involve an express contract with the Government is not fatal to plaintiff's Count IV taking claim."). In that circumstance, "the contractor may maintain both a takings claim and a contract claim." *Westfed Holdings, Inc.*, 52 Fed. Cl. at 152 (citing *Integrated Logistics Support Sys. Int'l, Inc*., 42 Fed. Cl. at 34). Moreover, even if the alternative breach of contract and takings claims would have the same recovery for the same harm, "the fact that a cause of action was pled under a contract theory did not preclude a separate count for a cause of action based on a taking." *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1369 (Fed. Cir. 2009) ("In this case, the trial judge denied the contract claim, and then dismissed without trial the takings claim on the ground that the contract claim precluded the takings claim. That is error."), *on reh'g in part*, 638 F.3d 781 (Fed. Cir. 2011); *accord Integrated Logistics Support Sys. Int'l, Inc*., 42 Fed. Cl. at 34 ("[T]aking claims are not presumed to be foreclosed by claims for breach of express contract merely because the claims share the same factual background." (citing generally, among other sources, *United States v. General Motors Corp*., 323 U.S. 373 (1945) (proposing Fifth Amendment takings clause as alternative means for relief in action involving alleged breach of express lease agreement))).

Count IV fits within that rule. Growth Opportunity does not seek damages for the EPA's failure to honor the Grant Agreement's obligations; those damages are linked to its breach of contract (Count I) and breach of the duty of good faith and fair dealing (Count II). Rather, Count IV points to Growth Opportunity's property interest in the funds that the EPA had already awarded, obligated, and made available through Growth Opportunity's ASAP account. FAC ¶¶ 141–50.

That is, regardless of whether or not the EPA breached the Grant Agreement, the EPA's removal of the obligated funds in reliance on subsequent congressional legislation was not contemplated by the parties when the Grant Agreement was executed and, therefore, the Fifth Amendment requires compensation for the rescission of those funds. *Id.* Whether Growth Opportunity ultimately can establish a cognizable property interest in the funds outside of the rights created by the Grant Agreement and separate from Growth Opportunity's breach of contract claim is a merits question that is better resolved after discovery. *E.g.*, *Barlow & Haun, Inc. v. United States*, 87 Fed. Cl. 428, 439 (2009) (explaining that this Court "routinely allow[s] Fifth Amendment taking allegations to proceed where breach of contract is pled as an alternative—at least until determining whether there has been a breach, and sometimes until the entry of judgment." (collecting cases)). Because Count IV is in the alternative, FAC ¶ 141, the existence of Growth Opportunity's contract claims does not itself require dismissal and, in fact, cautions against dismissal, as an early ruling could prevent Growth Opportunity from vindicating its rights under either theory. *Id.*; *see Consol. Edison Co. of N.Y. v. United States*, 67 Fed. Cl. 285, 292 (2005) ("[C]laims of a breach of contract and a taking may be brought concurrently and may proceed at least until the contract claim becomes viable and trumps the takings claim."). The Court should therefore deny the Motion.

Defendant's Motion should be denied in full. The Government treats the central disputed premise of Counts III and IV as an established fact: that Growth Opportunity lacked a cognizable interest in the $144.1 million when the EPA withdrew the ASAP authorization. Whether that premise is correct is a merits question not to be decided at this stage. The Court should decline to do so.

## I. Relevant Factual and Procedural Background

On July 12, 2024, the EPA awarded Growth Opportunity a $156.12 million Solar for All grant for an approved project running from May 1, 2024, through April 30, 2029. FAC ¶¶ 2, 39–47; Ex. F at 1. The EPA thereafter entered into a binding Grant Agreement, obligated the funding by October 25, 2024, and made the full grant amount available through Growth Opportunity's ASAP account. FAC ¶¶ 3–4.

On January 6, 2025, the EPA amended the Grant Agreement and limited its termination rights to "only" three specified circumstances: materially impairing noncompliance, adequate evidence of waste, fraud, or abuse, or material misrepresentation of eligibility. *Id*. ¶¶ 50–54, 82–85; Ex. F at 26.

The EPA invoked none of the permitted circumstances. It did not terminate the award based on grantee noncompliance, waste, fraud, abuse, or a misrepresentation of eligibility. Instead, the EPA terminated the award on the stated belief that subsequent legislation eliminated its statutory authority and appropriations. FAC ¶¶ 67–75; Ex. H at 1. Growth Opportunity alleges that this rationale did not satisfy the operative termination provision and did not authorize the EPA to reclaim the award. FAC ¶¶ 51–54, 68–75, 82–85, 111–18; Ex. F at 26.

The EPA then entered an authorization decrease of $144,102,757.27, leaving a balance of $10,845,444.10. FAC ¶¶ 56, 102; Ex. G at 1. This transaction is the factual focus of the disputed counts. Growth Opportunity does not allege merely that the EPA failed to make a payment upon request. It alleges a completed grant award, an obligation of identified funds, the availability of those funds through its ASAP account, and the EPA's subsequent withdrawal of the obligated funds on a ground that Growth Opportunity alleges lacked statutory or regulatory authorization. FAC ¶¶ 2–4, 50, 55–56, 102.

On May 11, 2026, Growth Opportunity filed its original complaint, asserting claims for breach of contract and breach of the duty of good faith and fair dealing. ECF No. 1. On August 26, 2026, Growth Opportunity moved for leave to amend its complaint to add alternative claims for illegal exaction and an unconstitutional taking. ECF No. 11. The Court granted leave on August 27, 2026. ECF No. 12. Growth Opportunity filed its First Amended Complaint on August 28, 2026, ECF No. 13, and a corrected First Amended Complaint on September 3, 2026, ECF No. 15.

## II. Standard of Review

To survive a motion to dismiss under Rule 8(a)(2) of the Rules of the U.S. Court of Federal Claims, Growth Opportunity's complaint must contain sufficient factual allegations, accepted as true and viewed in the plaintiff's favor, to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible where the pleaded facts permit the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard "is not akin to a 'probability requirement.'" *Id.* (citation omitted). Rather, it requires sufficient factual matter to raise the asserted right to relief above the speculative level. *Twombly*, 550 U.S. at 555–56; *e.g.*, *Aviation & Gen. Ins. Co., Ltd. v. United States*, 121 Fed. Cl. 357, 366 (2015) (holding that the plaintiff stated a plausible taking claim based on a contract because a subsequent executive order terminated plaintiff's financial interest in that contract without alternative means of recovery). The Court may consider the complaint, documents attached to it, and materials properly incorporated by reference. *See PGB Hanger, LLC v. United States*, 170 Fed. Cl. 473, 477 n.1 (2024).

Although "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to an assumption of truth, the Court must assume the

veracity of well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 678–79. Importantly, plausibility does not turn on whether the Court believes the plaintiff ultimately will prove those allegations. *Kam-Almaz v. United States*, 682 F.3d 1364, 1367–68 (Fed. Cir. 2012). As *Twombly* explains, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable" and recovery appears "very remote and unlikely." 550 U.S. at 556 (internal quotation marks omitted).

## III. Argument

### A. Growth Opportunity's Alternative Illegal Exaction Claim Should be Allowed to Proceed.

According to the Government, Growth Opportunity never acquired an interest in the obligated Solar for All funds because access to and use of those funds remained subject to various conditions. Mot. at 7–11. That argument fails for three reasons. *First*, the cited statutory, regulatory, monitoring, auditing, labor, notification, and drawdown requirements governed Growth Opportunity's use of the funds; they did not make the entire ASAP authorization revocable on any ground. *Second*, the FAC alleges that the EPA affirmatively removed an existing authorization, not merely that the EPA prevented a prospective transfer to Growth Opportunity's commercial bank account. *Third*, the cost regulations govern whether particular costs may be charged to an award; they do not impose the type of express recovery "strings" that controlled in *Columbus Regional Hospital*. Count III should therefore proceed.

#### i. Growth Opportunity's Interest in the Obligated Funds Was Not Contingent.

An illegal-exaction claim lies where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" because the money "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed. Cir. 1996)

(quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)). Payment "in effect" does not require a literal transfer to the Treasury; rather, it is enough that unlawful Government action caused the claimant to bear a monetary burden that otherwise belonged to the Government. *Id.* at 1573–74; *e.g.*, *Modern Sportsman, LLC v. United States*, 181 Fed. Cl. 746, 753–54 (2026) (holding that the plaintiff plausibly alleged payment "in effect" because "every dollar spent by Slide Fire to destroy the bump stocks was saved by the government"). Conversely, money merely "prevented from coming into [the] plaintiff's account" ordinarily is not an exaction of an existing monetary interest. *Piszel v. United States*, 833 F.3d 1366, 1377–78 (Fed. Cir. 2016) (quoting *Westfed Holdings, Inc.*, 52 Fed. Cl. at 153).

When the Government withdraws or recovers money previously provided or committed to a claimant, the related question is whether the claimant possessed an existing interest in retaining that money or whether the interest remained contingent on an operative Government recovery right. *See Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1348–49 (Fed. Cir. 2021). In *Columbus Regional Hospital*, "there were strings attached to FEMA's funds" because the governing agreement and regulation expressly authorized recovery of funds distributed through error, misrepresentation, or fraud, or spent inappropriately, and that authority remained operative when FEMA recovered the funds on those grounds. *Id.* at 1336, 1348–49. Once that authority expired, however, "those strings are cut," and recipients "may develop fully vested property interests in those funds." *Id.* at 1349. The pertinent inquiry is therefore whether the claimant possessed an existing interest in the disputed money and whether an operative provision authorized withholding, revocation, or recovery on the ground the Government invoked.

The FAC plausibly alleges an existing interest here. The EPA completed a $156.12 million award, obligated the funds, made them available through Growth Opportunity's ASAP account,

and later removed $144,102,757.27 from the authorization. FAC ¶¶ 2–4, 39–56, 102, 133–39. Count III therefore concerns the affirmative removal of an existing authorization, not merely the refusal to confer a prospective benefit.

The governing documents distinguish that authorization from conditions governing later use and drawdown.

General Condition 4 limits "EPA's financial obligations to the recipient" by "the amount of federal funding awarded to date," while separately warning that costs incurred "in anticipation of receiving additional funds" are incurred at the recipient's risk. EPA General Terms and Conditions at 3.[1] Growth Opportunity alleges an interest in the former: funds already awarded and obligated, not prospective additional funding. FAC ¶¶ 2–4, 39–56, 102, 133–39.

General Condition 5 similarly provides that ASAP requests are approved or rejected based on "available funds authorized by EPA in the recipient's ASAP account." EPA General Terms and Conditions at 3. The Proper Payment Drawdown provisions then regulate access to that authorization by limiting draws to "actual and immediate cash requirements" and requiring prompt disbursement. *Id*. at 4. Those provisions explain why funds remained in ASAP; they do not state that compliance with the required drawdown structure rendered the underlying authorization revocable for any reason.

The specified remedies confirm the distinction. The EPA may require return of excess or untimely disbursed drawdowns, recover the undisbursed portion of a noncompliant draw, change the payment method to reimbursement, or pursue specified noncompliance remedies. *Id*. Those

---

[1] The General Terms and Conditions at issue are referenced in the Government's Motion to Dismiss at pages 4 and 5. When cited herein, these terms and conditions are named "EPA General Terms and Conditions" for consistency. The link to these terms follows: https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf

are defined recovery rights tied to defined violations. But the FAC alleges that the EPA identified no improper drawdown, unallowable expenditure, or other violation authorizing recovery of $144,102,757.27. The EPA instead removed the authorization based on subsequent legislation and its asserted loss of authority and funding to administer Solar for All. FAC ¶¶ 82–102, 133–39.

Exhibit F independently limited the EPA's termination rights. The January 6, 2025, amendment stated that the EPA maintained termination rights "only" for materially impairing noncompliance, adequate evidence of waste, fraud, or abuse, or a material misrepresentation concerning eligibility. FAC ¶¶ 50–54, 82–85; Ex. F at 26. Again, the EPA invoked none of those grounds. FAC ¶¶ 82–102. Thus, the documents plausibly distinguish conditions governing Growth Opportunity's performance and use of the funds from the narrower conditions permitting the EPA to terminate the award or recover particular funds.

To be clear, Growth Opportunity alleges a narrow interest in funds already awarded, obligated, and authorized through ASAP, subject to conditions defining when amounts could be drawn, which costs were allowable, and when particular funds could be recovered. FAC ¶¶ 2–4, 50–56, 102, 133–39. Those limitations may define the scope of the alleged interest; they do not, standing alone, establish that the EPA could withdraw the entire authorization on the different ground actually invoked. At the pleading stage, the FAC plausibly alleges an existing monetary authorization rather than merely an expectancy in prospective funding.

#### ii. The Terms and Conditions Confirm That the EPA Removed an Existing Authorization, Rather Than Merely Prohibiting a Transfer from an ASAP Account to a Commercial Bank Account.

The Government separately argues that Growth Opportunity possessed no interest because the ASAP account only permitted it to request transfers to a commercial bank account. Mot. at 10.

But the relevant question is not whether the funds completed that final transfer. It is what legal consequence followed from the EPA's completed award, obligation, and ASAP authorization.

The EPA's Terms and Conditions distinguish the underlying authorization from a later payment request. General Condition 5 states that a request is "approved or rejected based on the amount of available funds authorized by EPA in the recipient's ASAP account." EPA General Terms and Conditions at 3. Consistent with that structure, the FAC alleges authorization first and removal second: the EPA awarded and obligated the funding, made it available through ASAP, and then entered an authorization decrease of $144,102,757.27. FAC ¶¶ 2–4, 56, 102, 133–39; Ex. G at 1.

Exhibit F supports that sequence. It identifies the $156.12 million award for a project period running from May 1, 2024, through April 30, 2029; the January 6, 2025, amendment then retained that award while removing the earlier two-percent funding restriction. FAC ¶¶ 39–54; Ex. F at 1, 26. Exhibit F therefore memorializes an existing award and then regulates drawdowns and use of that award; its compliance requirements do not erase the antecedent authorization they governed.

*Piszel* is distinguishable for the same reason. There, no money reached Piszel or an account in which he held an existing interest; the Government caused Freddie Mac not to pay the severance compensation, leaving the money "prevented from coming into [the] plaintiff's account." 833 F.3d at 1377–78, 1382 (citation omitted). Here, the FAC alleges that an ASAP authorization already existed and the EPA affirmatively decreased it. FAC ¶¶ 2–4, 56, 102, 133–39; Ex. G at 1. Whether that authorization ultimately constitutes a cognizable monetary interest is a merits question. *Piszel*'s no-payment rationale does not resolve it on the pleadings.

Nor do the drawdown rules compel a different result. They required Growth Opportunity to leave funds in the ASAP account until actual and immediate cash needs arose. EPA General Terms and Conditions at 4. Compliance with that requirement cannot simultaneously establish that Growth Opportunity never acquired any interest in the authorization it was required not to draw prematurely. At minimum, the legal consequences of the completed award, obligation, and authorization cannot be resolved solely from the absence of a final transfer to Growth Opportunity's commercial bank account.

#### iii. The Cost Regulations Do Not Impose the Type of Recovery "Strings" That Controlled in Columbus Regional Hospital.

The Government's cost-regulation argument depends on a mistaken analogy to *Columbus Regional Hospital*. According to the Government, Sections 200.100, 200.343, and 200.403 through 200.405 require costs to be incurred, allowable, reasonable, and allocable and therefore attach the same sort of "strings" that defeated the illegal-exaction claim in *Columbus Regional Hospital*. Mot. at 10–11. But *Columbus Regional Hospital* did not hold that any and all conditions governing the use of federal assistance leave the recipient without a cognizable interest in the funds. The "strings" that mattered there were express, preexisting rights to recover the very funds at issue for the very reasons FEMA invoked. The cost principles cited here do not create comparable recovery rights, and the EPA did not invoke a violation of those principles when it removed Growth Opportunity's remaining ASAP authorization.

*Columbus Regional Hospital* makes the relevant distinction clear. FEMA and Indiana had agreed that FEMA could recover assistance payments if the funds were distributed through "error, misrepresentation, or fraud, or if funds [were] spent inappropriately." *Columbus Reg'l Hosp.*, 990 F.3d at 1336, 1349. A FEMA regulation independently required an applicant to return funds if FEMA determined that the assistance had been provided erroneously, spent inappropriately, or

obtained through fraud. *Id*. at 1349 (citing 44 C.F.R. § 206.116(b)). The governing statute then established a defined closeout period during which FEMA could exercise that recovery authority. *Id*. (citing 42 U.S.C. § 5205(a)(1)). FEMA invoked those incorporated recovery provisions after an audit found procurement violations in four contracts and concluded that Columbus had spent disaster-assistance funds improperly. *Id*. at 1337, 1349. The Federal Circuit therefore held that Columbus's interest remained contingent because FEMA recovered the funds on a ground expressly reserved in the agreement and regulation, within the period in which that recovery right remained operative. *Id*. at 1348–49.

The incorporated cost principles are not recovery provisions of that kind. Section 200.100(c) defines their function: Subpart E establishes principles for determining allowable costs incurred under federal awards, and "[t]hese principles are for the purpose of cost determination." 2 C.F.R. § 200.100(c). The regulation then expressly states that the cost principles "do not address the circumstances nor dictate the extent of Federal Government funding of a particular program or project." *Id*. Thus, the regulations the Government identifies as the relevant "strings" disclaim authority over the question for which the Government cites them. They determine which expenditures may be charged to an existing award; they do not determine whether the EPA may terminate the award, de-obligate its entire remaining balance, or eliminate an existing ASAP account authorization.

Sections 200.403 through 200.405 confirm that limited role. Section 200.403 lists the attributes a particular cost must possess to be allowable, including necessity, reasonableness, allocability, consistency, proper accounting treatment, and adequate documentation. 2 C.F.R. § 200.403(a)–(g). Section 200.404 asks whether "a given cost" exceeds what a prudent person would incur under the circumstances. 2 C.F.R. § 200.404. Section 200.405 determines whether "a cost"

is assignable to a particular award based on the relative benefits received and prohibits shifting a cost from one federal award to another to overcome a funding deficiency or restriction. 2 C.F.R. § 200.405(a), (c). Each provision operates cost by cost. None, standing alone, reserves a right to withdraw the entire undrawn balance for reasons unrelated to a determination concerning particular costs.

Section 200.343 likewise does not impose a *Columbus Regional Hospital*-type recovery string. It addresses the allowability of costs following suspension or termination, generally disallowing costs arising from obligations incurred during suspension or after termination while preserving qualifying obligations properly incurred beforehand. 2 C.F.R. § 200.343(a)–(b). It does not itself identify an independent ground authorizing termination of an award or withdrawal of the entire remaining authorization.

The Government's reimbursement characterization does not change that analysis. The cost principles may limit payment to costs that Growth Opportunity actually incurred and that satisfy allowability, reasonableness, and allocability requirements. But a limitation on which costs may be charged to an award is not the same as an express reservation permitting the EPA to revoke the award itself. In *Columbus Regional Hospital*, the agreement and regulation identified the recoverable funds, the grounds for recovery, and the period during which FEMA could recover them. 990 F.3d at 1348–49. Sections 200.100, 200.343, and 200.403 through 200.405 identify no corresponding ground for the EPA to remove the full ASAP account authorization because Congress later repealed the program's statutory authorization and rescinded unobligated balances.

Nor does Exhibit F convert the cost principles into such a recovery condition. Exhibit F stated that the EPA maintained termination rights "only" for materially impairing noncompliance, adequate evidence of waste, fraud, or abuse, or a material misrepresentation concerning eligibility.

FAC ¶¶ 50–54, 82–85; Ex. F at 26. Incorporating cost principles into the award governed which expenditures Growth Opportunity could charge to that award. It did not expand the separately enumerated termination grounds or provide that every dollar remained revocable until Growth Opportunity incurred and documented a qualifying cost. Reading the incorporated cost regulations as an unrestricted reservation of withdrawal authority would erase Exhibit F's express use of "only" and collapse the distinction between disallowing a particular cost and terminating the entire award.

The FAC also alleges no factual predicate comparable to the one FEMA invoked in *Columbus Regional Hospital*. The EPA did not identify an incurred cost that was unnecessary, unreasonable, unallocable, inconsistently treated, improperly documented, or otherwise unallowable. It did not seek to recover a specific payment because that payment had been distributed through error, misrepresentation, or fraud, or because Growth Opportunity had spent it improperly. And it did not rely on an audit finding that Growth Opportunity violated procurement or cost requirements. *See* FAC ¶¶ 50–54, 82–102, 133–39. Instead, the EPA terminated the award and removed $144,102,757.27 from the ASAP authorization based on subsequent congressional action and the EPA's asserted loss of authority and funding to continue administering Solar for All. *Id.* ¶¶ 86–102, 133–39. The alleged basis for the EPA's action therefore fell outside both the cost principles and Exhibit F's enumerated termination predicates.

The Government's analogy thus overreads *Columbus Regional Hospital*. That decision turned on FEMA's express, still-operative right to recover the disputed funds on the grounds FEMA invoked. 990 F.3d at 1348–49. Here, the cost principles do not themselves supply the asserted withdrawal authority because they regulate the chargeability of individual expenditures and expressly disclaim determining the extent of federal funding. 2 C.F.R. § 200.100(c). And the

FAC alleges that the EPA invoked none of the circumstances in which Exhibit F permitted unilateral termination. FAC ¶¶ 50–54, 67–75, 82–85; Ex. F at 26.

At most, the cited regulations establish that Growth Opportunity could obtain payment only for costs that were incurred, allowable, reasonable, and allocable and that certain costs incurred after termination would not be reimbursable. Those limitations may define the permissible use and precise scope of Growth Opportunity's asserted interest. But they do not establish that the interest never existed, that all obligated funds remained subject to revocation for any reason, or that the EPA could erase the entire ASAP account authorization based on a ground unrelated to cost allowability. Because the cost regulations do not impose the type of express recovery strings that controlled in *Columbus Regional Hospital*, they do not defeat Count III at the pleading stage.

### B. Growth Opportunity's Alternative Unconstitutional Taking Claim Should Be Allowed to Proceed.

The Government advances two arguments for dismissing Count IV. *First*, it contends that because Growth Opportunity's asserted property interest arises from the Grant Agreement, its claim sounds in contract rather than under the Fifth Amendment. Mot. at 11–14. *Second*, if Count IV is construed as alleging a taking of contractual rights, the claim fails because Growth Opportunity remains able to seek breach damages. *Id*. at 14.

Neither argument warrants dismissal. To the first argument, a takings claim is not foreclosed simply because the asserted property interest originated in a contractual relationship. Rather, the relevant question is whether the scope of the alleged taking differs from the scope of the contract. Count IV alleges that if the EPA possessed lawful sovereign authority to terminate, the Government exercised that authority to take Growth Opportunity's distinct property interest in the funds themselves—which the EPA had already awarded, obligated, and made available through ASAP—without just compensation. FAC ¶¶ 140–49. Whether Growth Opportunity can ultimately

establish that cognizable property interest is a merits question better resolved on a developed record. *See Barlow & Haun, Inc.*, 87 Fed. Cl. at 439. To the second argument, the Government acknowledges that Growth Opportunity has alleged a taking of obligated funds from its ASAP account, not a taking of a contractual right. Mot. at 14. Therefore, case law requiring Growth Opportunity to forgo damages for that breach of a contractual right is of no moment. In any event, this hypothetical claim does not prohibit the alternative taking claim from proceeding with the affirmative breach claims. *See Consol. Edison Co. of N.Y.*, 67 Fed. Cl. at 292. The Court should therefore permit Count IV to proceed.

**i. Growth Opportunity Plausibly Alleges that It Has a Cognizable Property Interest in the Obligated Solar for All Funds Distinct from its Contractual Rights Under the Grant Agreement.**

The Government begins from the premise that because Growth Opportunity's interest in the disputed funds arose in connection with the Grant Agreement, any interference with that interest necessarily sounds only in contract and a takings claim must "fail[]." Mot. at 11–14.

The Government is wrong. The existence of an express contract—and even affirmative claims for breach of that contract—does not, by itself, foreclose a takings claim. *Integrated Logistics Support Sys. Int'l, Inc.*, 42 Fed. Cl. at 34 ("That the circumstances confronting plaintiff involve an express contract with the Government is not fatal to plaintiff's Count IV taking claim."). Indeed, "the fact that a cause of action was pled under a contract theory [does] not preclude a separate count for a cause of action based on a taking." *Stockton E. Water Dist.*, 583 F.3d at 1369. Instead, a takings claim arising from a contractual relationship may proceed when "the scope of the alleged taking differs from the scope of the contract." *Westfed Holdings, Inc.*, 52 Fed. Cl. at 152.

Count IV plausibly alleges such a property interest distinct from the contractual rights under the Grant Agreement. That is, if the EPA possessed lawful authority as sovereign to terminate the award because of later legislation, the EPA's exercise of that authority took Growth Opportunity's existing property interest in funds that had already been "awarded, obligated, and made available to Growth Opportunity through an ASAP account." FAC ¶¶ 141, 143. Put differently, Count IV does not seek relief merely for the EPA's failure to comply with the Grant Agreement's termination provisions, which is the injury alleged in Count I, but rather seeks just compensation for funds that were taken by the federal government after those same funds were awarded, obligated, and made available in Growth Opportunity's ASAP account. *Compare id.*, *with id.* ¶ 111 ("EPA breached the express terms of Growth Opportunity's Grant Agreement by wrongfully terminating the Grant Agreement. EPA's Termination Memorandum identified no facts constituting substantial noncompliance, material impairment of performance, waste, fraud, abuse, or an eligibility-related misrepresentation as required by the Amended Grant Agreement." (Count I)). Courts have recognized that such alternative theories may proceed at the pleading stage. *E.g.*, *Aviation & Gen. Ins. Co.*, 121 Fed. Cl. at 362–66 (denying dismissal under Rule 12(b)(6) because the insurers plausibly alleged cognizable property interests in intangible contractual rights that subsequent legislation and executive action had extinguished).

*A & D Auto Sales, Inc. v. United States* is particularly instructive because the Federal Circuit rejected an argument similar in structure to the Government's argument here. 748 F.3d 1142, 1152–53 (Fed. Cir. 2014). There, the Government argued that the dealers possessed no compensable property interest because bankruptcy law already permitted rejection of their franchise agreements. *Id.* at 1152. The Federal Circuit recognized that preexisting "'background principles' of law may 'inhere' in a plaintiff's title to his property and thereby limit his ability to

recover for a taking." *Id.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 (1992)). But the court distinguished those preexisting limitations from governmental restrictions imposed after the plaintiff acquired the property interest. *See id.* at 1152–53 ("If a challenged restriction was enacted after the plaintiff's property interest was acquired, it cannot be said to 'inhere' in the plaintiff's title."). Because the challenged Government action "did not predate the acquisition of the plaintiffs' interests," it did not inhere in those interests, and the court held that "[t]he plaintiffs' franchise agreements are valid and compensable property interests." *Id.* at 1153.

The same distinction supports Growth Opportunity's pleading-stage theory. The FAC alleges that the EPA awarded $156.12 million, obligated the funding, and authorized the funds through ASAP before the subsequent congressional action on which the EPA relied to terminate the award and eliminate the remaining authorization. FAC ¶¶ 2–4, 50–56, 143–49. Thus, the later legislation was not a preexisting restriction when the award and authorization arose. *See* FAC ¶¶ 50–54, 67–75, 82–85, 143–49. Count IV therefore alleges that subsequent sovereign action eliminated an asserted interest that already existed. *See* FAC ¶¶ 141, 143–49.

The EPA's alleged basis for terminating the award further distinguishes Count IV from an ordinary contractual breach. The EPA did not terminate because Growth Opportunity failed to perform an obligation under the Grant Agreement, incurred an unallowable cost, failed an audit, or violated a condition governing a drawdown. *See* FAC ¶¶ 50–54, 82–85, 143–49. Rather, after Congress repealed Section 134 and rescinded unobligated balances, the EPA terminated Growth Opportunity's award based on the subsequent change in law and its asserted lack of statutory authority and funding to continue administering the Solar for All program. *See* FAC ¶¶ 86–97, 143–49. The asserted justification for eliminating Growth Opportunity's interest arose from subsequent sovereign action, rather than from a limitation that allegedly inhered in the interest

when it was created. *See* FAC ¶¶ 50–54, 82–97, 141, 143–49. Those allegations support a takings theory that differs in scope and legal premise from the alleged breach of the Grant Agreement. *See Aviation & Gen. Ins. Co.*, 121 Fed. Cl. at 362–66; *A & D Auto Sales, Inc.*, 748 F.3d at 1152–53.

The Government notes, even if the above is true, that Growth Opportunity "cannot state a claim for taking because the only reason it has ASAP account is to request transfer of federal funds … as it performs its obligations under the [G]rant [A]greement." Mot. at 13–14. In the Government's view, the cognizable property interest is a result of the "contractual relationship itself, not any Fifth Amendment taking concern." *Id.* at 14. But Count IV's asserted taking is not predicated upon who or what controls the ASAP account. Instead, Count IV is focused on the obligated funds that were located in Growth Opportunity's ASAP account before being removed from the account without just compensation. Accordingly, the identity of the entity administering the ASAP payment system does not, standing alone, resolve whether Growth Opportunity has a cognizable property interest in the obligated funds that were removed by the EPA. Whether those funds are properly characterized as federal funds awaiting final disbursement or as funds in which Growth Opportunity already held a legally cognizable interest presents a disputed question concerning the Grant Agreement, the legal consequences of the EPA's obligation and authorization, and the operation of ASAP. The Government's request to resolve those issues on an undeveloped record is premature.

When faced with "unique" facts and a record consisting of "little more than the plaintiffs' allegations," the Federal Circuit has cautioned against deciding important takings questions on an "underdeveloped record" and declined to resolve issues that required further factual development. *A & D Auto Sales*, 748 F.3d at 1150 (citation omitted). That restraint is particularly appropriate here because Count IV is expressly pleaded in the alternative. FAC ¶ 141. If the Grant Agreement

controlled the EPA's termination authority and the EPA terminated outside the circumstances the Agreement permitted, Growth Opportunity's contract claims provide the avenue for relief. In contrast, Count IV preserves the alternative question whether that later sovereign action took Growth Opportunity's preexisting interest in funds already awarded, obligated, and made available for its authorized use without just compensation. Case law permits those alternative theories to proceed together while the nature and scope of the asserted rights are still being determined. *Consol. Edison Co. of N.Y.*, 67 Fed. Cl. at 292 ("[C]laims of a breach of contract and a taking may be brought concurrently and may proceed at least until the contract claim becomes viable and trumps the takings claim."); *Barlow & Haun, Inc.*, 87 Fed. Cl. at 439 (explaining that this Court "routinely allow[s] Fifth Amendment taking allegations to proceed where breach of contract is pled as an alternative—at least until determining whether there has been a breach, and sometimes until the entry of judgment." (collecting cases)). At this stage, the Court should not resolve those fact-dependent questions against Growth Opportunity on an undeveloped record.

Count IV nevertheless plausibly alleges a property interest distinct from the EPA's contractual promise and an affirmative sovereign act that eliminated that asserted interest. The Court should therefore deny the Government's request to dismiss Count IV.

#### ii. The Government's Hypothetical Growth Opportunity Contractual Right Takings Claim Does Not Foreclose Its Alternative Fifth Amendment Taking Claim.

As mentioned, Growth Opportunity has not alleged a taking of a contractual right; it has only alleged a taking of obligated funds from its ASAP account. FAC ¶¶ 143–49. That much the Government understands. Mot. at 14. Accordingly, the Government's provided authorities, requiring the Government to prevent Growth Opportunity from seeking damages from that breach of a contractual right in order to pursue a Fifth Amendment claim, are of no moment because

Growth Opportunity never alleged that claim. And, case law does not prohibit the alternative takings claim Growth Opportunity actually pleaded from proceeding with the affirmative breach claims. *See Consol. Edison Co. of N.Y.*, 67 Fed. Cl. at 292. The Court should deny the Motion for this reason as well.

## IV. Conclusion

For these reasons, the Court should deny Defendant's Motion in full. The Government's Motion turns on the legal consequences of the Grant Agreement, the status of the funds when the EPA removed them, and the authority under which the EPA acted—questions that can only be properly resolved on the merits.[2] In any event, Growth Opportunity has plausibly alleged that the EPA acted without authority in removing its obligated funds, stating claims for both illegal exaction (Count III) and a Fifth Amendment taking (Count IV). As to Count III, Growth Opportunity plausibly alleges that the EPA awarded and obligated $156.12 million in Solar for All funds, made them available through Growth Opportunity's ASAP account, and then withdrew $144,102,757.27 without statutory or regulatory authorization. As to Count IV, whether Growth Opportunity held a cognizable property interest in those funds outside the contractual relationship is a merits question that cannot be resolved on the pleadings. Counts III and IV should proceed.

Dated: November 10, 2026 Respectfully submitted,

[2] Of note, the merits may be easily resolved. The United States District Court for the District of Columbia recently held that: "Whatever the practical consequences of Congress's rescission of unobligated administrative funds, they do not change the fact that Congress expressly chose to leave obligated grant funds undisturbed. Because EPA's termination of the [Solar for All] program rested on a contrary reading—that § 60002 reached obligated funds as well—the Elimination Decision both exceeded the agency's statutory authority and was arbitrary and capricious." *Harris Cnty., Texas v. United States Env't Prot. Agency*, No. 25-CV-3646 (TSC), 2026 WL 2837849, at *8 (D.D.C. Sept. 22, 2026). In other words, the Court may likewise follow *Harris County* in holding that the EPA's actions here exceeded the agency's authority, thereby resolving a key issue in this case.

SEYFARTH SHAW LLP

By:*/s/ Edward V. Arnold*
Edward V. Arnold
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC 20004
Telephone: (202) 463-2400
Facsimile: (202) 828-5393
Email: earnold@seyfarth.com

*Counsel of Record for Plaintiff Growth Opportunity Partners*

*Of Counsel:*

Ashton P. Jones-Doherty
SEYFARTH SHAW LLP
975 F Street NW
Washington, DC 20004
ajones-doherty@seyfarth.com